Alan L. Schlosser (SBN 49957)
aschlosser@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm St.
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

Brad Seligman (State Bar No. 083838)
bseligman@impactfund.org
Jocelyn D. Larkin (SBN 110817)
Alvaro D. Soria (SBN 247532)
IMPACT FUND
125 University Ave., Suite 102
Berkeley, CA 94710
Telephone: (510) 845-3473
Facsimile: (510) 845-3654

Oren M. Sellstrom (SBN 161074)
osellstrom@lccr.com
Kendra Fox-Davis (SBN 248757)
Charles Forster (SBN 252826)
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO BAY
AREA
131 Steuart St., Suite 400
San Francisco, CA  94105
Telephone: (415) 543-9444
Facsimile: (415) 543-0296

Richard A. Marcantonio (SBN 139619)
Rmarcantonio@publicadvocates.org
Michelle Natividad Rodriguez (SBN 226683)
PUBLIC ADVOCATES, INC.
131 Steuart St., Suite 300
San Francisco, CA 94105
Telephone: (415) 431-7430
Facsimile: (415) 431-1048

Attorneys for Plaintiffs SANTEYA DANYELL WILLIAMS,
MARY RUTH SCOTT, KAREN LATREECE COLEMAN,
PRISCILLA BUNTON, and ALYCE DENISE PAYNE.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANTEYA DANYELL WILLIAMS, MARY RUTH SCOTT, KAREN LATREECE COLEMAN, PRISCILLA BUNTON, and ALYCE DENISE PAYNE, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> CITY OF ANTIOCH, <br><br> Defendant. | Case No.: C-08-2301 BZ <br><br> **FIRST AMENDED COMPLAINT** <br><br> [CLASS ACTION] <br><br> JURY TRIAL DEMANDED |

## INTRODUCTION

1.    The ongoing real estate crisis has made the City of Antioch's homes more affordable, especially to federally subsidized "Section 8" households. Many of these households are African-American, and have taken advantage of lower rents so they could move to a safer community with good schools. In just the last five years the African-American population in the City of Antioch has doubled, in part the result of a dramatic increase in the number of Section 8 households. The City has reacted with alarm and hostility to the newcomers, choosing to scapegoat them as the cause of economic downturn because they allegedly bring blight and crime into the community. Powerful leaders in the City fear its changing racial demographics, looking towards more heavily African-American populated cities like Richmond as harbingers of the future.

2.    The City and the Antioch Police Department, including a special unit created to target Section 8 households, have engaged in a concerted campaign to reduce the African-American Section 8 population and discourage any additional Section 8 families from moving to Antioch. Such efforts include: focusing investigations of alleged tenant-caused disturbances on African-American households of Antioch believed to participate in the Section 8 program; soliciting complaints from neighbors and others about African-American Section 8 households; and conducting unlawful searches of these residences. This campaign of harassment and intimidation extends to some of the landlords of these tenants, who are threatened by the Antioch Police Department in letters, calls, and in person, with criminal and civil liability to discourage them from renting to Section 8 participants. In addition, the Antioch Police Department complains to the local Housing Authority in charge of the Section 8 program with the goal of having participants' Section 8 voucher benefits terminated.

3.    This class action is accordingly brought by all African-Americans who have held, currently hold, may hold, or are erroneously regarded by the City and officers of the Antioch Police Department as holding, Section 8 housing vouchers and all members of their households who reside, have resided or will reside, in the City Antioch. Plaintiffs, and the class they

represent, charge that the City of Antioch intentionally discriminates against African-American Section 8 households on the basis of their race and/or source of income, and has pursued policies and practices that have an unjustified adverse impact upon them.

4.     This class action primarily seeks to end the City's discriminatory and unlawful policies and practices.  Secondarily, this action seeks statutory minimum damages for the class, and additional damages for the named plaintiffs.

## JURISDICTION AND VENUE

5.     Plaintiffs' claims arise under the Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*, and 42 U.S.C. § 1983.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.  Pursuant to 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the rights of the parties and to grant all further relief deemed necessary and proper.

6.     The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over claims under the California Constitution, California Fair Employment & Housing Act, Cal. Gov't Code § 12940, *et seq.*, California Gov't Code § 11135, the Bane Act, Cal. Civ. Code § 52.1, and common law torts.

7.     Venue lies in United States District Court for the Northern District of California pursuant to 28 U.S.C. §§ 84 and 1391 because a substantial part of the events that gave rise to the claims alleged in this complaint arose in the County of Contra Costa and Defendant resides and conducts business in the County of Contra Costa.

## INTRADISTRICT ASSIGNMENT

8.     The claims alleged herein arose in the County of Contra Costa. This action is properly assigned to the Oakland or San Francisco Division of the United States District Court for the Northern District of California pursuant to Civil Local Rule 3-2(d).

## PARTIES

9.     Plaintiff Santeya Danyell Williams is an African-American female who resides in the City of Antioch, County of Contra Costa, State of California.

10.   Plaintiff Mary Ruth Scott is an African-American female who resides in the City of Antioch, County of Contra Costa, State of California.

11.   Plaintiff Karen Latreece Coleman is an African-American female who resides in the City of Antioch, County of Contra Costa, State of California.

12.   Plaintiff Priscilla Bunton is an African-American female who resides in the City of Antioch, County of Contra Costa, State of California.

13.   Plaintiff Alyce Denise Payne is an African-American female who formerly resided in the City of Antioch, and currently resides in Bay Point, both in the County of Contra Costa, State of California.

14.   At all times relevant, each of the individual Plaintiffs named in the paragraphs 9-13 was, and continues to be, eligible for rent subsidy benefits under the federally-funded Section 8 Housing Choice Voucher Program ("HCVP" or "Voucher Program") commonly known as "Section 8," and codified at 42 U.S.C. § 1437f.  Each plaintiff currently receives Section 8 benefits.

15.   On information and belief, Defendant City of Antioch ("City" or "Antioch") is a municipal corporation which includes, operates, governs and is responsible for the Antioch Police Department ("APD") pursuant to the laws of the State of California.

16.   Plaintiffs are informed and believe that Defendant caused, and is responsible for the below-described unlawful conduct and resulting injuries in that Defendant participated in the unlawful conduct or acted jointly with others who did so; authorized, acquiesced in or set in motion actions that led to the unlawful conduct; failed to take action to prevent the unlawful conduct; failed and refused, with deliberate indifference to Plaintiffs' rights, to initiate and maintain adequate training and supervision; failed to prevent further harm to Plaintiffs; and/or ratified the unlawful conduct and actions by employees and agents under Defendant's' direction and control, including failure to take remedial action.

## CLASS ALLEGATIONS

17.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all African-Americans who have held, currently hold, may hold, or are erroneously regarded by the City and officers of the Antioch Police Department as holding, Section 8 housing vouchers, and all members of their households, who reside, have resided or will reside, in the City Antioch.  Plaintiffs are members of the class they seek to represent.

18.    The members of the class are sufficiently numerous that joinder of all members is impracticable.  Plaintiffs are informed and believe that the class exceeds 800 individuals.

19.    There are questions of law and fact common to the class and these questions predominate over individual questions.  Such questions include, among others: (1) whether Defendant's customs, policies and practices discriminate against members of African-American Section 8 households in the City of Antioch; (2) whether Defendant's common customs, policies and practices have had a disparate impact on members of African-American Section 8 households in the City of Antioch; (3) whether any disparate impact is justified by necessity and, if so, whether there are less discriminatory alternatives to Defendant's policies and practices; (4) whether the disparate impact constitutes a violation of the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*; (5) whether the disparate impact constitutes a violation of California Government Code § 11135, and/or the California Fair Employment & Housing Act, Cal. Gov't Code § 12940, *et seq.*; (6) whether the City of Antioch has engaged in customs, policies, and practices of disparate treatment adverse to members of African-American Section 8 households; (7) whether that disparate treatment violates 42 U.S.C. § 1983, the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*, California Constitution article I, section 7, the Bane Act, Cal. Civ. Code § 52.1, Cal. Gov't Code § 11135, and the California Fair Employment & Housing Act, Gov't Code § 12940, *et seq.*; (8) whether the conduct of Defendant constitutes a custom. policy, and practice of discrimination, coercion, intimidation, threats or interference on the basis of source of income prohibited by the California Fair Employment & Housing Act, Gov't Code § 12940, *et seq.*; (9) whether defendant

has engaged in a custom, policy and practice of unlawful searches of class member homes in violation of the Fourth Amendment of the United States Constitution, article 1, section 13 of the California Constitution and the Bane Act, Cal. Civ. Code § 52.1; and (10) whether injunctive relief, other equitable remedies and statutory minimum damages are warranted for the class.

20.    The claims alleged by Plaintiffs are typical of the claims of the class.

21.    The Plaintiffs will fairly and adequately represent the interests of the class.

22.    Class Certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because the City of Antioch has acted and/or refused to act on grounds generally applicable to the class, making appropriate declaratory and injunctive relief with respect to the class as a whole. The members of the class are entitled to injunctive relief to end Antioch's discriminatory and unlawful policies and practices targeting African-American Section 8 households. Declaratory and injunctive relief are the primary goal of this litigation. Damages relief is secondary, incidental and ancillary to the declaratory and injunctive claims.

23.    This action is also properly maintainable as a class action under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the class predominate over any questions affecting only individual class members, and a class action is superior to other available methods for the fair and efficient adjudication of this case. This action is also properly maintainable under Rule 23(c)(4)(A) for all class issues alleged herein.

## THE SECTION 8 HOUSING CHOICE VOUCHER PROGRAM

24.    The Section 8 Housing Choice Voucher Program ("Voucher Program") is a federally-funded housing program whose purpose includes "aiding lower-income families in obtaining a decent place to live and … promoting economically mixed housing." 42 U.S.C. § 1437f(a).

25.    The Voucher Program is one of several programs authorized under 42 U.S.C. § 1437f and administered by local public housing authorities; in Plaintiffs' case, the Housing Authority of the County of Contra Costa ("HACCC") administers approximately 9,100 Housing Choice Vouchers, including about 1,582 Section 8 households in the City of Antioch.

26.    Voucher Program funds are paid directly from the Department of Housing and Urban Development ("HUD") to HACCC.  *See* 42 U.S.C. § 1437f(a), (o)(1)(A).  In administering the Voucher Program, HUD enters into annual contribution contracts with HACCC, and HACCC agrees to establish local polices and administer the program.  *See* 42 U.S.C. § 1437f(b)(1), (o)(1)(A); *see also* Housing Authority of the County of Contra Costa, Section 8 Administrative Plan, Ch. 1, Part II.C. (*available at* http://64.143.89.96/AdminPlan/index.htm) [hereinafter *Section 8 Admin Plan*].

27.    HACCC issues vouchers to eligible applicants and enters into contracts with landlords.  42 U.S.C. § 1437f(o)(2)-(4); *Section 8 Admin Plan*, Ch. 1, Part II.C.  In its contract with the landlord, HACCC agrees to make timely monthly rental payments "to the owner on behalf of the family." *Section 8 Admin Plan*, Ch. 13, Part II.C.  Also, when the housing "subsidy for a family exceeds the rent to owner, the family is due a utility reimbursement.  HUD permits HACCC to pay the reimbursement to the family or directly to the utility provider." *Id.* Ch. 6, Part III-A; 24 C.F.R. § 982.514(b).

28.    The Voucher Program emphasizes the objective of "Housing Choice" because its express legislative purpose is to permit low-income participants to relocate to higher opportunity neighborhoods such as those found in Antioch, where better schools and/or jobs may be found, and thereby escape the deleterious social conditions which often exist in primarily poor, lower opportunity neighborhoods.

29.    The Voucher Program requires a participant who has been awarded a housing voucher to find a private landlord who is willing to accept the participant as a tenant.  42 U.S.C. § 1437f(o)(6).  Under the program, the housing costs of a low-income Section 8 participant are subsidized such that the participant pays the landlord 30% of his or her income as rent, with the difference between the participant's payment and the market rent covered by the federal subsidy. 42 U.S.C. § 1437f(o)(2).

30.    As a condition of receiving benefits, Voucher Program participants agree to abide by a list of "tenant obligations" which include, *inter alia*, not engaging in criminal activity which

threatens the health, safety, or right to peaceful enjoyment of neighbors; and not allowing a person not named on the lease to reside on the premises without the permission of the public housing authority.  42 U.S.C. § 1437f(o)(7)(D); 24 C.F.R. § 982.551(h), (l).

31.    However, to avoid blaming victims for the actions of perpetrators, disturbances resulting from domestic violence are specifically excluded as a permissible reason for terminating a participant's benefits or evicting the tenant.  42 U.S.C. § 1437f(o)(7)(C), (o)(20)(A).

**THE CITY OF ANTIOCH AND THE COMMUNITY ACTION TEAM**

32.    In 2003, the number of households that received Section 8 Housing Choice Vouchers from HACCC and chose to live in Antioch was 1,049.  By 2007, this number had grown to 1,582, approximately 4.37% of the total number of the City's households.  Although three-quarters of Section 8 voucher participants live in the poorer northwestern side of town, some have been able to rent in the more affluent and newer southeastern part of town.  Because of the downturn in the Antioch housing market beginning in 2006, and the inability of homeowners and speculators to sell their homes, Section 8 Voucher participants were able to use their benefits to rent larger homes that would otherwise have been left vacant and/or lost to foreclosure.

33.    By February 2006, officials in Antioch were publicly attributing problems in the City to an influx of Section 8 households.  City Councilmember Jim Davis complained that Section 8 participants "seem to be a magnet for problems throughout the city of Antioch. . . . I want to see what recourse, as a city, we have to limit the numbers [of Section 8 households]." Sarah Krupp, *City Seeking New Rental Regulations*, Contra Costa Times, Feb. 27, 2006, at F4. At a September 2006 public hearing before the Contra Costa Board of Supervisors, Mayor Donald Freitas stated, "if the city of Antioch has ten percent of the county population, but has sixteen percent of Section 8 housing, it is a reason for concern."  Other City officials reported that "neighbors' complaints have led them to believe that renters and Section 8 recipients [were] creating problems [in Antioch]."  Krupp, *Regulations*, *supra*, at F4.

34.    In April 2006, Councilmember Davis called for the City to create its own agency to "handle complaints about Section 8 housing." Rowena Coetsee, *City Wants Say in Section 8 Housing*, Contra Costa Times, Apr. 27, 2006, at F4.  Soon after, City officials, "police and code-enforcement personnel decided to look more closely at the number of calls for service involving . . . Section 8 housing." Rowena Coetsee, *City to Study Low-Income Housing Complaints*, Contra Costa Times, May 3, 2006, at F4.  According to a report the City issued in November 2006, City leaders believe Antioch is home to a disproportionate number of subsidized tenants and that "their behavior patterns are disruptive; and they bring crime, drugs and disorder to the neighborhood."

35.    Beginning in May 2006, APD attempted to obtain a list of all Section 8 properties in Antioch in order to determine "whether Section 8 households are responsible for a disproportionate number of police calls." Coetsee, *Study*, *supra*, F4.  In addition, the City's "number crunching [would] enable the city to ratchet up the pressure on troublemakers." *Id.* The APD reported that the addresses of so-called "repeat offenders" on Section 8 — those whose residences had been the focus of multiple service calls — would be given to the Housing Authority to provide "a basis for revoking eligibility" for Section 8 housing assistance. *Id.*  APD Corporal Barry Delavan explained, "We need a referral system, and that's what we're trying to work out." *Id.*

36.    In May 2006, as the foreclosure crisis was heating up, some Antioch residents "complained [to the City Council] . . . that low-income residents receiving federal housing assistance [were] dragging the city down by increasing crime and causing blight." Sarah Krupp, *Residents Decry Section 8 Tenants*, Contra Costa Times, May 10, 2006, at F4.  Certain public officials and residents accused the Housing Authority of neglecting its duty by "failing to monitor Section 8 landlords and tenants who [were] causing blight and crime." Sarah Krupp, *Housing Chief Says Satellite Will Help Area*, Contra Costa Times, May 19, 2006, at F4.  Around the same time, signs appeared on the doors of a number of renters in the City, which were not

placed there by either the renters or their landlords, stating: "No More Rentals.  No More Section

8.  Save Antioch NOW.  We THE RESIDENTS are watching YOU."

37.    In and about July of 2006, the City and the Antioch Police Department created a

unit called the "Community Action Team" ("CAT") within the police department.  Although

ostensibly aimed at addressing "quality of life" issues throughout Antioch, from the outset the

City Council created CAT, and it has been CAT's practice, to disproportionately focus on

Section 8 voucher participants, and particularly on those residing in the more affluent

neighborhoods of Antioch, southeast of the railroad tracks.

38.    At a September 2006 Contra Costa County Board of Supervisors meeting, Council

members accused the HACCC of not moving quick enough to root out problem tenants who

diminish the area's quality of life.  At the meeting, Mayor Freitas requested "more enforcement"

of Section 8 regulations by HACCC.  Councilman Jim Conley added, "We care about violations.

. . . The city of Antioch is going to be on this issue like a pit bull — we're not going to let this

one go."

39.    While the conduct of APD and CAT are focused on Section 8 households in the

City of Antioch, the City and APD have specifically targeted African-Americans they believe

hold Section 8 vouchers.  Defendant perceives that the Section 8 tenants who are "problem

tenants" are primarily African-American holders of Section 8 vouchers.  This perception and

targeting has been confirmed by repeated statements by the elected representatives of the City,

its police Chief and members of the APD, often by contrasting Antioch with the City of

Richmond, which has a substantial African-American population.  Thus, for example, at a

December 2007 City Council meeting, Councilman Brian Kalinowski justified CAT's actions by

warning that "unless we want to be a community, like the City of Richmond, that is faced with

42 homicides so far this year in their community, if we want to be like that community, then all

we have to do is not take action."  Councilman Arne Simonsen reiterated, at the same meeting,

that the City Council would not stand by and let Antioch "go to hell" like Richmond.  Plaintiffs

are informed and believe that the goal of the City is to force African-American Section 8

1  households to move out of Antioch, and to discourage any new Section 8 households from

2  locating there.

3      40.   On information and belief, James Hyde is the Chief of Police for the City of

4  Antioch.  In this capacity, he is responsible for the administration of APD and the training and

5  supervision of its officers, and for the compliance of APD officers with the Constitution of the

6  United States, the California Constitution, and applicable law.

7      41.   On information and belief, Sergeant Mitchell Schwitters, Officer Desmond Bittner,

8  and Officer William Dillard are and at all times material to this complaint were employees of

9  Defendant City and the APD.

10      42.   Each officer named in paragraphs 40 and 41 is, and at all times material to this

11  complaint was, duly employed, appointed and acting, as a sworn peace officer of APD, under

12  color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs and

13  usages of the State of California and/or the City of Antioch.

14      43.   On information and belief, Defendant City, APD and Police Chief Hyde are, and at

15  all times material to this complaint were, responsible for the employment, training, supervision,

16  and discipline of officers Schwitters, Bittner, and Dillard.

17      44.   On information and belief, at all times material to this Complaint, Officers

18  Schwitters, Bittner and Dillard were assigned to the APD Community Action Team ("CAT").  At

19  all times material to this complaint, these officers acted within the scope of their employment

20  with Defendant City and APD.

21         **DEFENDANT'S CUSTOM, POLICIES AND PRACTICES**

22      45.   In establishing CAT to investigate complaints of disturbance and nuisance

23  occurring in residential units, Defendant City of Antioch intended and knew, and intends and

24  continues to know, that a primary focus of CAT would and will continue to be households

25  participating in the Section 8 Housing Choice Voucher Program, and that one of CAT's principal

26  activities would and will continue to be gathering evidence that Section 8 Housing Choice

27  Voucher participants allegedly were and are violating the obligations owed by participants to

HACCC as conditions of receiving these benefits. Thus, while rental housing makes up only 25% of Antioch households, 85% of CAT investigations involve rental housing. Moreover, although voucher participants make up only 5% of Antioch households (one-fifth of all rental housing), two-thirds of CAT investigations involve homes where voucher participants reside.

46. The brunt of CAT investigations falls disproportionately on African-Americans. African-Americans constitute only about 14% of Antioch households yet they are subject to approximately two-thirds of all CAT investigations. Furthermore, while African-Americans constitute 56% of Antioch Section 8 households, 70% of all CAT referrals to HACCC involve African-American families.

47. On receiving a complaint reporting a disturbance or nuisance in a residential neighborhood, including domestic violence related incidents, APD and CAT have made and continue to make special efforts to determine if a household member involved in the incident is a participant in the Section 8 Housing Choice Voucher Program. If so, the complaint of disturbance or nuisance is forwarded by Defendant to HACCC, often with the suggestion that the participant be terminated from the Voucher Program for violating his or her tenant obligations imposed on participants by 24 C.F.R. § 982.551.

48. Data from 2007 shows that the HACCC declined to terminate more than 60% of the time that CAT referred a Section 8 household for termination. Furthermore, the rate of "unfounded referrals" by CAT to HACCC in 2006 and 2007 was significantly higher for Voucher Program participants identified as African-American. According to HACCC data, 71.8 percent of unfounded referrals by CAT involved African-American participants, and only 17.9 percent involved White participants.

49. Plaintiffs are informed and believe that APD and CAT also target African-Americans whom they erroneously believe receive Section 8 housing assistance. Defendant had and continues to have a policy, pattern and practice of asking African-Americans under investigation whether they own or rent their home and whether they are Section 8 voucher participants.

50.    Plaintiffs are informed and believe that, in addition to CAT officers, other Antioch police officers have been involved in conducting investigations and searches of Section 8 households and those suspected of being Section 8 households.  These non-CAT officers refer suspected Section 8 voucher participants to CAT for further investigation.  On information and belief, Plaintiffs allege that African-American Section 8 households are disproportionately subject to these investigations.

51.    Defendant had and continues to have a policy, pattern and practice of seeking to search and searching the homes rented by African-American Section 8 voucher participants or those erroneously believed by Defendant to be Section 8 voucher participants.  Such searches have been and are unreasonable and unlawful, in that they have been done without lawful authority and/or have exceeded the scope of any lawful authority.  Plaintiffs are informed and believe that African-American Section 8 households are disproportionately subject to this conduct.

52.    To conduct these searches, Defendant, through APD and CAT, had, and continues to have, a policy, pattern and practice of relying on the alleged parolee or probationer status of a person having a relationship to the Section 8 voucher participant to establish a purported basis to search that Section 8 household if the participant does not actually consent to the search. Plaintiffs are informed and believe that African-American Section 8 households are disproportionately subject to this conduct.

53.    Plaintiffs are informed and believe that Defendant, through APD and CAT, had, and continues to have, a policy, pattern and practice of informing neighbors of African-American Section 8 households that the household is receiving Section 8 housing assistances and soliciting and encouraging nuisance, disturbance and other criminal activity calls about the Section 8 household.

54.    In investigating African-American Section 8 households, Defendant had, and continues to have, a policy, pattern and practice of compiling records of disturbance calls to the Section 8 households, and forwarding these compilations to HACCC purportedly as evidence of

1   violent criminal activity, or criminal activity that threatens the health, safety, or right to peaceful

2   enjoyment of other residents or neighbors and which violate obligations owed by the Voucher

3   participant to HACCC. Defendant engaged in this practice with little investigation as to whether

4   the Voucher participant was the perpetrator or responsible party for the disturbance, even in

5   incidents involving domestic violence perpetrated on the Voucher participant herself, and with

6   little investigation as to whether the calls have merit. On information and belief, Plaintiffs allege

7   that African-American Section 8 households are disproportionately subject to this conduct.

8       55.   Defendant had and continues to have a policy, pattern and practice of sending

9   letters or otherwise communicating to landlords of Section 8 tenants stating that their tenant had

10  engaged in criminal and/or nuisance activity, and advising the landlord that she or he could be

11  held criminally or civilly responsible. Defendant's policy and practice is to follow up these

12  letters with frequent calls or visits to landlords. Plaintiffs are informed and believe that these

13  communications were and are disproportionately made to landlords of African-American

14  Voucher participants. On information and belief, Plaintiffs allege that Defendant encourages

15  landlords to evict and refuse to rent to African-Americans.

16      56.   The aforementioned conduct of Defendant City of Antioch reflects a policy, pattern

17  and practice of discrimination, harassment and coercion against African-American Section 8

18  households and African-Americans whom Defendant erroneously believes to be part of Section 8

19  households. The conduct of Defendant has a disproportionate adverse impact upon African-

20  Americans in Antioch that is not justified by necessity. Even if justified, there are less

21  discriminatory alternatives to the measures taken by Defendant.

22      57.   As a matter of custom, policy and practice, APD inadequately and improperly

23  supervises and trains its police officers, including the officers identified herein, thereby failing to

24  adequately discourage constitutional and statutory violations on the part of its officers. As a

25  matter of custom, policy and practice, the City and APD authorize and/or ratify the unlawful and

26  discriminatory conduct and behavior of Antioch police officers especially when such unlawful

27  and discriminatory conduct and behavior is directed at African-American citizens.

58.    The customs, policies and practices described above were, and continue to be, carried out by Defendant under color of state, local, or municipal law.

**CLAIM OF PLAINTIFF SANTEYA DANYELL WILLIAMS**

59.    Plaintiff Santeya Danyell Williams lives in Antioch with her children, and is a participant in the Section 8 Housing Choice Voucher Program.  After receiving the voucher, Ms. Williams decided to move out of Oakland to Contra Costa County.  Ms. Williams settled in Antioch because of better educational opportunities at its schools.

60.    In January 2007, Antioch police officers visited Plaintiff's home, responding to Plaintiff's request for assistance to stop a threat of domestic violence against Plaintiff Williams from one Mr. Batieste.  Plaintiff Williams suffered from an incident of domestic violence, and her oldest son called APD to assist his mother.  According to an APD Incident Report dated January 24, 2007, on January 21, 2007 at 11:39 a.m., officers arrived at Ms. Williams' residence in response to an incident of domestic violence in which she was the victim.

61.    APD records show that after officers learned Ms. Williams was a participant in the Voucher Program, their focus turned toward finding grounds to terminate her housing benefits. According to the same APD Incident Report, notes on January 22, 2007 state:

> ABOVE RESIDENCE IS ON SECTION 8 ASSISTANCE.  PATROL WAS
> RECENTLY AT THE RESIDENCE FOR A DOMV AND DISCOVERED
> THAT THE RESPONSIBLE WAS AN UNAUTHORIZED RESIDENT OF
> THE HOME.

62.    On information and belief, on or about January 22, 2007, CAT officers came to Ms. Williams' home to ask whether Mr. Batieste had returned to the residence.  When Ms. Williams invited them into her home to talk, the officers proceeded to search her home without her consent.  While the purported purpose of the search was to locate Mr. Batieste, the APD officers searched the entire home, including the closets and drawers, for evidence that Mr. Batieste was living at Ms. Williams' residence.

63.    On or about March 28, 2007, CAT Officer Mitchell Schwitters (Badge No. 2008) sent a letter in the name of Antioch Police Chief James Hyde directed to Ms. Williams' landlord, advising him that:

> While investigating complaints about the family at this address, [officers] discovered that problems were being caused by an adult male living in the house. This male is most likely not on the lease. We also discovered that the family living in your property has two pit bull dogs that have been causing a nuisance to the surrounding neighborhood.

The letter warned that the landlord could be "held responsible for criminal or nuisance related activity" on his property; asked for "immediate compliance regarding the listed issues [to] avoid criminal abatement and or civil litigation"; and warned that "should [the landlord] fail to take reasonable steps to prevent any future unlawful use of this property [the landlord] will not be considered an 'innocent owner' in any future action …"

64.    On information and belief, APD also conveyed these accusations to HACCC as purported violations of the obligations owed by Plaintiff to HACCC in January 2007. HACCC thereafter issued a notice proposing to terminate Ms. Williams' voucher benefits for violating the prohibition on unauthorized household residents and/or criminal activity that threatens the health, safety, or right to peaceful enjoyment of other residents or neighbors. Plaintiff requested a hearing at which Officer Desmond Bittner (Badge No. 3252) testified. In a decision dated April 30, 2007, HACCC's hearing officer issued a decision finding these allegations to be unsupported, and refused to sustain the proposed termination.

65.    As a resident of Antioch, Plaintiff Williams and her household continue to be subjected to the policies and practices of the City and APD. Moreover, APD's practices cause Ms. Williams to fear contacting APD for any purpose and avoid inviting individuals to her home because she might be subjected to further APD interference.

### CLAIM OF PLAINTIFF MARY RUTH SCOTT

66.    Plaintiff Mary Ruth Scott lives with her children in Antioch and is a participant in the Section 8 Housing Choice Voucher Program. Ms. Scott lived in Antioch as a child, and

moved back to the city because she believed Antioch provided a good environment to raise her children, with good schools and open spaces.

67.     On January 11, 2007, according to an APD report in Case Number 07000534, CAT officers began an investigation of Ms. Scott's home "due to constant domestic disputes at the location." The APD report, which is dated January 17, 2007, also explained the CAT officers "investigate[ ] homes that are causing neighborhood disturbances."

68.     On or about January 16, 2007, CAT officers, including Officers Schwitters, Bittner, and William Dillard (Badge No. 3978), forcibly entered the home of Ms. Scott. The officers wrongfully claimed authorization to search Ms. Scott's house based on an arrest warrant for Tyrone Young, who was visiting her home. The warrant, however, did not list Ms. Scott's address and therefore was not within the scope of the warrant. Plaintiff Scott told the officers not to enter her house, but they represented to her that their warrant allowed them to enter her house. When Ms. Scott asked the CAT Officers to see a copy of the warrant they refused to show it to her. The officers searched Ms. Scott's entire house and garage, including cupboards and bedroom drawers. At the time, Ms. Scott was pregnant and at home with her one year-old daughter.

69.     Officer Bittner sent a letter in the name of Antioch Police Chief Hyde directed to HACCC on or about January 18, 2007 to report alleged violations of Plaintiff's obligations as a participant in the Section 8 Housing Choice Voucher Program. The January 18 letter stated CAT "received a complaint from an APD patrol officer, who advised us that there had been numerous domestic disputes at [Ms.] Scott's residence. The officer also advised that the residence is possibly on Section eight assistance and that an unauthorized male named Tyrone Young was living at the location." The letter alleged that Mr. Young's presence at the home constituted a violation of Ms. Scott's Section 8 Voucher Program Family Obligations. On information and belief, Office Bittner issued the January 18, 2007 letter with the intent of inducing HACCC to terminate Ms. Scott's Section 8 voucher benefits.

70.    On and about March 28, 2007, Officer Schwitters sent a letter in the name of Antioch Police Chief Hyde directed to Ms. Scott's landlord, advising him that APD had "arrested an adult male who we found to be living in the home [and who] is most likely not on the lease." The letter warned that the landlord could be "held responsible for criminal or nuisance related activity" on his property; asked for "immediate compliance regarding the listed issues [to] avoid criminal abatement and or civil litigation"; and warned that "should [the landlord] fail to take reasonable steps to prevent any future unlawful use of this property [the landlord] will not be considered an 'innocent owner' in any future action."

71.    Plaintiffs are informed and believe that from January or February 2007 to October 2007, CAT officers called Ms. Scott's landlord on an almost weekly basis to ask if the landlord had evicted Ms. Scott and why she had not yet been evicted. The officers continued to warn Ms. Scott's landlord that he could be held responsible for the alleged criminal or nuisance related activity at Ms. Scott's home. The landlord was also told by an Antioch police officer to be careful about renting to African-American tenants.

72.    HACCC thereafter terminated Ms. Scott's Section 8 Voucher. Plaintiff sought judicial review of the termination decision. Before the court could complete its review, HACCC rescinded its termination decision. Ms. Scott continues to live in Antioch and continues to receive housing benefits under the Section 8 Voucher Program.

73.    As a resident of Antioch, Plaintiff Scott and her household continue to be subjected to policies and practices of the City and APD. Moreover, APD's practices cause Ms. Scott to fear contacting APD for any purpose and avoid inviting individuals to her home because she might be subjected to further APD interference.

## CLAIM OF PLAINTIFF KAREN LATREECE COLEMAN

74.    Plaintiff Karen Latreece Coleman lives in Antioch with her children and is a participant in the Section 8 Housing Choice Voucher Program. Ms. Coleman moved from Pittsburg to Antioch in 2003 in order to live in the same city as her three sisters, one of whom

1  recently died of breast cancer.  Ms. Coleman also believed Antioch would be a peaceful place for

2  her family to live.

3        75.  In June 2007, APD officers, including CAT officer Bittner, came to Plaintiff's

4  home in the early morning, claiming to have authorization to search Plaintiff's home looking for

5  Thomas Coleman, Plaintiff's husband.  The officers purportedly based their authority to search

6  Plaintiff's home on Mr. Coleman's status as a parolee.  On information and belief, Mr.

7  Coleman's parole officer denied authorization for a parole search and gave APD officers

8  authorization for only a compliance check of Mr. Coleman.  Although Plaintiff objected to the

9  search, the officers persisted, damaged the front door, searched the home, took photographs, and

10  told Plaintiff that she would lose her Section 8 benefits.  Officers handcuffed Mrs. Coleman

11  during the search and threatened to handcuff her child if he called the police station to speak to

12  their supervisor.

13        76.  Officer Schwitters sent a letter in the name of Antioch Police Chief James Hyde

14  directed to HACCC on or about June 27, 2007 to report alleged violations of Plaintiff's

15  obligations as a participant in the Section 8 Housing Choice Voucher Program.  The June 27

16  letter alleged that Mr. Coleman's presence at the home constituted a violation of Mrs. Coleman's

17  Section 8 Voucher Program Family Obligations.  On information and belief, Office Schwitters

18  issued the March 21, 2007 letter with the intent of inducing HACCC to terminate Mrs.

19  Coleman's Section 8 voucher benefits.

20        77.  Plaintiff had previously requested that HACCC add Mr. Coleman to her lease, and

21  permission was granted on June 29, 2007.  Mr. Coleman now lives with Plaintiff.

22        78.  On information and belief, CAT officers attempted to conduct another search of

23  Mrs. Coleman's residence on or about July 3, 2007.  The officers again purportedly based their

24  authority to search Plaintiff's home on Mr. Coleman's status as a parolee.  Mrs. Coleman again

25  objected to the search, and this time the officers did not conduct a search.

26        79.  On information and belief, CAT officers returned a third time to Mrs. Coleman's

27  home on and about July 2007 looking for Mr. Coleman.  Mrs. Coleman again refused to consent

to a search.  CAT officers proceeded to handcuff Mrs. Coleman and put her in the back of their police car for approximately half-an-hour.  Mrs. Coleman's sister arrived at the residence and, although it is not her home, she let the officers into Mrs. Coleman's home.  The officers then searched the home.  After completing their search of the residence, the officers released Mrs. Coleman.

80.    On or about July 3, 2007, CAT Officers Bittner and Schwitters visited Mr. Coleman's place of employment and questioned him about residing with his wife.  Although Mr. Coleman told the officers that he now was on the lease with his wife, they threatened him with arrest if he was found at Plaintiff's home.  The CAT officers also asked to see Mr. Coleman's employment records but were turned down by his employer.  APD officers made several such visits to Mr. Coleman's place of employment.

81.    On information and belief, CAT officers contacted Mrs. Coleman's landlord as part of their efforts to force her and her husband out of their Antioch home.

82.    As a resident of Antioch, Plaintiff Coleman and her household continue to be subjected to the policies and practices of the City and APD.  Moreover, APD's practices cause Mrs. Coleman to fear contacting APD for any purpose and avoid inviting individuals to her home because she might be subjected to further APD interference.

## CLAIM OF PLAINTIFF PRISCILLA BUNTON

83.    Plaintiff Priscilla Bunton lives with her children in Antioch and is a participant in the Section 8 Housing Choice Voucher Program.  Ms. Bunton moved to Antioch to be closer to her mother who has lived in Antioch for several years.  Ms. Bunton also believed that Antioch provided better living conditions for her children.

84.    On or about September 25, 2006, according to an APD report in Case Number 06-009645, CAT officers Bittner and Dillard approached Ms. Bunton's residence to discuss noise complaints about her household made by her neighbors.  They encountered Ms. Bunton's boyfriend, Keith Carter, in the driveway of her home and discovered there was a warrant for his arrest.  The officers arrested Mr. Carter.

FIRST AMENDED COMPLAINT – C-08-2301 BZ        - 20 -

85.    The officers then approached Ms. Bunton and asked to enter the home to allow them to search for Mr. Carter's identification.  Ms. Bunton refused to consent to the search without a warrant.  The officers misrepresented that they were authorized to search Ms. Bunton's home based on Mr. Carter's parolee status.  The CAT officers searched the entire home, including drawers, and allegedly discovered men's clothing in a closet and other men's personal items in a bedroom.

86.    Officer Bittner sent a letter in the name of Antioch Police Chief Hyde directed to HACCC on or about September 26, 2006, to report alleged violations of Plaintiff's obligations as a participant in the Section 8 Housing Choice Voucher Program.  The letter alleged that Mr. Carter was an unauthorized resident of Ms. Bunton's home, and that Ms. Bunton's neighbors complained about loud music from her residence and juveniles playing basketball late at night in the backyard.

87.    On information and belief, Office Bittner issued the September 26 letter with the intent of inducing HACCC to terminate Ms. Bunton's Section 8 voucher benefits.  HACCC issued a notice proposing to terminate Plaintiff Bunton's voucher benefits on March 22, 2007.  Ms. Bunton requested a hearing at which Officer Bittner testified.  HACCC terminated her benefits based on information that Mr. Carter allegedly was an unauthorized resident of Ms. Bunton's household.  Ms. Bunton sought judicial review of the termination decision.  The Martinez Superior Court set aside the decision and remanded the proceeding to HACCC because the hearing officer's findings of fact were not supported by evidence in the record and he had not considered evidence submitted by Ms. Bunton.  On remand, HACCC rescinded its termination decision.

88.    Ms. Bunton continues to live in Antioch and continues to receive housing benefits under the Section 8 Voucher Program.

89.    As a resident of Antioch, Plaintiff Bunton and her household continue to be subjected to the policies and practices of the City and APD.  Moreover, APD's practices cause

1  Ms. Bunton to fear contacting APD for any purpose and avoid inviting individuals to her home

2  because she might be subjected to further APD interference.

### CLAIM OF PLAINTIFF ALYCE DENISE PAYNE

4  90.    Plaintiff Alyce Denise Payne lived in Antioch with her children until her landlord

5  terminated her tenancy at the behest of APD and CAT.  Plaintiff was then, and currently is, a

6  participant in the Section 8 Housing Choice Voucher Program.  Ms. Payne moved to Antioch to

7  better the life of her family and show her family that they could "make it" outside of Oakland.

8  91.    In January 2007, APD officers visited Plaintiff's home in Antioch, responding to

9  Plaintiff's request for assistance to stop threats of domestic violence against Ms. Payne by

10  Edward Shivers.  In the previous two years, Ms. Payne had requested police assistance on a

11  number of occasions to stop domestic violence perpetrated by Shivers.

12  92.    On or about March 21, 2007, CAT Officer Dillard contacted HACCC to report

13  alleged violations of Plaintiff's obligations as a participant in the Section 8 Housing Choice

14  Voucher Program.  The March 21 letter states:  "the constant need for police presence and

15  nuisance to the immediate vicinity of the premises constitutes a violation of . . . [the Section 8

16  Voucher Program's] Family Obligations Form . . . ."  The letter also recited Ms. Payne's alleged

17  criminal record, and that of her children and Mr. Shivers.  This recitation included incidents that

18  did not occur at Ms. Payne's home or have any relation to her eligibility for Section 8 voucher

19  benefits.  Furthermore, some information in the letter related to a juvenile, which was

20  confidential under Calif. Welf. & Inst. Code § 827.

21  93.    On information and belief, APD issued the March 21, 2007 letter with the intent of

22  inducing HACCC to terminate Ms. Payne's Section 8 voucher benefits.  HACCC thereafter

23  issued a notice proposing to terminate Plaintiff's voucher benefits for violating the prohibition

24  against drug-related criminal activity, or violent criminal activity, or other criminal activity that

25  threatens the health, safety, or right to peaceful enjoyment of other residents or neighbors.  After

26  Plaintiff secured legal representation, HACCC withdrew its termination notice.

27

94.    On or about March 28, 2007, CAT officer Schwitters sent a letter in the name of

Antioch Police Chief Hyde directed to Ms. Payne's landlord, advising him that

> [t]he current residents of your home have been involved in criminal activity and
> have recent arrests by APD.  Since they have resided in your home, APD has
> responded to the residence on (2) separate disturbance calls.  At their previous
> residence . . . APD responded to the location approximately (29) times primarily
> for disturbance related incidents.

The letter warned that the landlord could be "held responsible for criminal or nuisance related

activity" on his property, asked for "immediate compliance regarding the listed issues [to] avoid

criminal abatement and or civil litigation", and warned that "should [the landlord] fail to take

reasonable steps to prevent any future unlawful use of this property [the landlord] will not be

considered an 'innocent owner' in any future action."

95.    Plaintiffs are informed and believe that on or about March 20, 2007, an APD officer

telephoned Ms. Payne's landlord and advised him about the allegations and facts described in

paragraphs 91-92, and 94.

96.    When the March 28, 2007 letter did not lead Plaintiff's landlord to evict Ms. Payne,

CAT officers followed up with a second letter dated October 4, 2007.  The October 4 letter

referenced the March 28 letter and March 20 call, and alleged that APD officers had responded

to additional calls about the residence.  The October 4 letter advised the landlord that his

property might constitute a public nuisance under Cal. Penal Code § 370 and of his responsibility

that his property not create a public nuisance to the neighboring community and the City of

Antioch.

97.    In and about December 2007, Plaintiff's landlord, citing both APD letters, advised

Ms. Payne that her lease would not be renewed and her family must move.  Plaintiff thereafter

vacated her home and, after unsuccessfully seeking housing in Antioch, moved to nearby Bay

Point, California, where she continues to receive rent subsidies for her new home from the

Section 8 Housing Choice Voucher Program.

98.    Since moving to Bay Point, HACCC has determined that Ms. Payne qualifies for a larger home with more bedrooms.  Therefore, Ms. Payne will be required to move to a larger home.  While fearful of the policies and practices of the City and APD that target African Americans, Ms. Payne has and will continue to seek housing in Antioch because her grandson, of whom she has full custody, is in a daycare program there.

**NOTICE OF PLAINTIFFS' CLAIMS**

99.    Plaintiffs Williams, Scott, Coleman, and Payne timely served notices of claims for money damages against the City of Antioch for the aforementioned conduct pursuant to California Government Code §§ 910-996.6, which claims were rejected.  Each notice alleged that the conduct was part of an illegal policy and practice of discriminatory targeting of African-Americans who participate in the Section 8 Voucher Program in Antioch.  All damage claims made in this action are incidental to and secondary to the injunctive relief claims.

**FIRST CLAIM FOR RELIEF**

**42 U.S.C. § 3617 (Violation of Fair Housing Act)**

**(On behalf of Individual Plaintiffs and Class Against Defendant)**

100.  Plaintiffs incorporate by reference the allegations set forth in the paragraphs above.

101.  Each named Individual Plaintiff is an African-American and thus a member of a class protected by the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*

102.  In searching or attempting to search the homes of Plaintiffs Williams, Scott, Coleman and Bunton for evidence that the participant had violated obligations owed by the participant to HACCC, police officers of Defendant City coerced, intimidated, threatened, or interfered with each Plaintiff's exercise or enjoyment of renting her home in violation of 42 U.S.C. § 3617.

103.  In notifying HACCC of domestic violence incidents, alleged criminal activity and violations of Section 8 Housing Choice Voucher Program obligations involving Plaintiffs, Defendant coerced, intimidated, threatened, or interfered with each Plaintiff's exercise or enjoyment of renting her home in violation of 42 U.S.C. § 3617.

104.  In notifying the landlords of Plaintiffs that their tenants were involved in criminal, nuisance, and/or other disturbances in and about the premises rented by each Plaintiff, Defendant coerced, intimidated, threatened, or interfered with each Plaintiff's exercise or enjoyment of renting her home in violation of 42 U.S.C. § 3617.

105.  The actions described in the paragraphs above constitute coercion, intimidation, threats, or interference by Defendant in the exercise or enjoyment by class members of renting their homes, in violation of 42 U.S.C. § 3617.  The aforementioned conduct is part of a policy, pattern and practice of coercion, intimidation, threats and interference with Plaintiffs' and Class Members' enjoyment of their fair housing rights, including the right to live in the community of their choice free of discrimination on the basis of race.  This policy, pattern and practice is the result of intentional discrimination by Defendant.  In addition, Defendant's policy, pattern and practice of focusing on Section 8 tenants has had and continues to have an adverse impact upon African-Americans that is not justified by necessity.

## SECOND CLAIM FOR RELIEF

### 42 U.S.C. § 1983 (Denial of Equal Protection)

### (On Behalf of Individual Plaintiffs and Class Against Defendant)

106.  Plaintiffs incorporate by reference the allegations set forth in the paragraphs above.

107.  The foregoing conduct of Defendant denied Plaintiffs and the class they represent equal protection of the law in violation of the Fourteenth Amendment to the Constitution of the United States.

108.  At all times relevant, APD and CAT officers, including Officers Schwitters, Bittner, and Dillard, were on-duty police officers acting under color of state law in their official capacities, and under the supervision of Antioch Police Chief Hyde.

109.  The above described actions evidence a custom, policy or practice of Defendant City of Antioch and its Police Department of intentionally discriminating on the basis of race and of denying African-American Section 8 voucher participants, and those erroneously believed to be Section 8 voucher participants, equal protection on the basis of their race.

### THIRD CLAIM FOR RELIEF

**42 U.S.C. § 1983 (Violation of Fourth Amendment)**

**(On Behalf of Individual Plaintiffs and Class Against Defendant)**

110.  Plaintiffs incorporate by reference the allegations set forth in the paragraphs above.

111.  By entering and proceeding to search the dwellings of Plaintiffs Williams, Scott, Coleman and Bunton, without their consent and without a warrant, Defendant, through the actions of APD and CAT officers, conducted unreasonable searches and seizures in violation of the Fourth Amendment to the Constitution of the United States.

112.  The above described actions evidence a custom, policy and practice of Defendant City of Antioch and its Police Department of conducting unlawful searches of households of Plaintiffs and the class they represent in violation of the Fourth Amendment to the United States Consitution.

### FOURTH CLAIM FOR RELIEF

**Cal. Const. art. I, § 7 (Denial of Equal Protection)**

**(On Behalf of Individual Plaintiffs and Class Against Defendant)**

113.  Plaintiffs incorporate by reference the allegations set forth in the paragraphs above.

114.  The foregoing conduct of Defendant denied Plaintiffs and the class they represent equal protection of the law in violation of California Constitution article I, section 7.

### FIFTH CLAIM FOR RELIEF

**California Gov't Code § 11135 and Its Implementing Regulations**

**(On Behalf of Individual Plaintiffs and Class Against Defendant)**

115.  Plaintiffs incorporate by reference the allegations set forth in the paragraphs above.

116.  California Government Code § 11135 provides, in relevant part: "No person in the State of California shall, on the basis of race … be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is

1  conducted, operated, or administered by the state or by any state agency, is funded directly by

2  the state, or receives any financial assistance from the state."

3      117.  California Code of Regulations §§ 98101(i)(l) and (2) prohibit recipients of state

4  funding from utilizing criteria or methods of administration which have the effect of

5  discriminating against protected groups.

6      118.  Plaintiffs are informed and believe that Defendant, its police department and CAT

7  are programs that receive financial assistance from the State of California, thus subjecting them

8  to the prohibitions of Government Code § 11135 and its implementing regulations.

9      119.  Defendant's activities have subjected Plaintiffs and the Class they represent to

10  discrimination on the basis of race, and that the adverse effect of those activities, fall

11  disproportionately on African-Americans, and therefore have had, and will continue to have, the

12  effect of discriminating against Plaintiffs and Class members on the basis of race.

13  

**SIXTH CLAIM FOR RELIEF**

14  **California Gov't Code § 12940, *et seq.* (Violation of California Fair Employment &**

15  **Housing Act)**

16  **(On behalf of Individual Plaintiffs and Class Against Defendant)**

17      120.  Plaintiffs incorporate by reference the allegations set forth in the paragraphs above.

18      121.  Plaintiffs and the class they represent are protected by the provisions of the Fair

19  Employment & Housing Act, Gov't Code § 12940, *et seq.*, because they are African-Americans

20  and because they have, or are believed to have, a lawful, verifiable source of income (Section 8

21  Housing Assistance), paid directly to a representative of the tenant (HACCC).

22      122.  The foregoing conduct of Defendant constitutes discrimination, coercion,

23  intimidation, threats and interference on the basis of race and source of income, or perceived race

24  and source of income, against Plaintiffs and the class they represent.  This conduct constitutes a

25  policy, pattern and practice of intentional discrimination in violation of the Fair Employment &

26  Housing Act.  This conduct also has a discriminatory impact on Plaintiffs and the class they

27  represent and is not necessary to achieve an important purpose sufficiently compelling to

override the discriminatory effect or to effectively carry out the purpose it is alleged to serve. Even if the aforementioned conduct were necessary, there are feasible alternatives that would equally well or better accomplish the purpose advanced with a less discriminatory effect.

## SEVENTH CLAIM FOR RELIEF

### Cal. Const. art. I, § 13

**(On Behalf of Individual Plaintiffs and Class Against Defendant)**

123.  Plaintiffs incorporate by reference the allegations set forth in the paragraphs above.

124.  By entering and proceeding to search the dwellings of Plaintiffs Williams, Scott, Coleman and Bunton, without their consent and without a warrant, Defendant, through the actions of APD and CAT officers, conducted unreasonable seizures and searches in violation of the California Constitution article I, section 13.

125.  The above described actions evidence a custom, policy and practice of Defendant City of Antioch and its Police Department of conducting unlawful searches of households of Plaintiffs and the class they represent in violation of the California Constitution article I, section 13.

## EIGHTH CLAIM FOR RELIEF

### California Civil Code § 52.1 (Violation of the Bane Act)

**(On Behalf of Individual Plaintiffs and Class Against Defendant)**

126.  Plaintiffs incorporate by reference the allegations set forth in the paragraphs above.

127.  The conduct alleged herein violates the Bane Act, Cal. Civ. Code § 52.1 ("Bane Act").

128.  The Bane Act protects individuals in the exercise or enjoyment of rights secured by "the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of [California]" from actual or attempted interference "by threats, intimidation or coercion" by persons, whether or not acting under color of law.

129.  Defendant, through the actions of APD and CAT officers, has violated the rights of the individual Plaintiffs and class members protected by federal and state law.

FIRST AMENDED COMPLAINT – C-08-2301 BZ          - 28 -

130.  As a direct and proximate cause of Defendant's actions, Plaintiffs Williams, Scott, Coleman, Bunton and Payne have suffered actual damages, including emotional distress, in an amount according to proof, and said damages may be trebled.  The class Plaintiffs represent also has suffered actual damages.  Each class member is entitled to minimum damages of $4,000 for each offense, pursuant to Californian Civil Code § 52(a).

### NINTH CLAIM FOR RELIEF

**Intentional Infliction of Emotional Distress**

**(On Behalf of Individual Plaintiffs Against Defendant)**

131.  Plaintiffs incorporate by reference the allegations set forth in the paragraphs above.

132.  Defendant's conduct directed at Plaintiffs Williams, Scott, Coleman, Bunton and Payne was outrageous.  That conduct was intended to cause injury or was undertaken in reckless disregard of the probability of causing injury to Plaintiffs, and did, in fact, cause Plaintiffs serious emotional distress.

### TENTH CLAIM FOR RELIEF

**Negligent Infliction of Emotional Distress**

**(On Behalf of Individual Plaintiffs Against Defendant)**

133.  Plaintiffs incorporate by reference the allegations set forth in the paragraphs above.

134.  At all relevant times, Defendant owed Plaintiffs the duty to act with reasonable care and not cause personal injury or loss or damage to the property of Plaintiffs Williams, Scott, Coleman, Bunton and Payne or the interest in their respective properties. Defendant owed individual Plaintiffs the legal duty not to discriminate against them on the basis of their race or source of income.  Defendant owed individual Plaintiffs the legal duty not to violate their constitutional rights.  Defendants also owed individual Plaintiffs the duty to adequately train and supervise Defendant's employees, and to adopt and/or enforce policies and procedures for the proper hiring, training, and supervision of Defendant's employees.

135.  By their acts and omissions, Defendants breached the above mentioned duties owed to Plaintiffs Williams, Scott, Coleman, Bunton and Payne. Further, it was reasonably foreseeable that their breach of duty would cause emotional harm to Plaintiffs and the loss of or damage to Plaintiffs' property and/or interest in property.

## ELEVENTH CLAIM FOR RELIEF

### Tortious Interference With Contractual Relationship

### (On Behalf of Individual Plaintiffs Against Defendant)

136.  Plaintiffs incorporate by reference the allegations set forth in the paragraphs above.

137.  At all times prior to her vacating the premises, Plaintiff Payne and her landlord had a valid contract for the rental of 1975 Mokelumne Drive, Antioch, California.  Implied in the contract was a covenant of good faith and fair dealing between Ms. Payne and her landlord.

138.  In contacting Plaintiff Payne's landlord through the above described letters and calls containing unsupported allegations that Plaintiff and her family had engaged in criminal or unlawful activity on the premises, Defendant induced the landlord to terminate Plaintiff's lease and procured a breach by the landlord of the covenant of good faith and fair dealing owed to Plaintiff.

139.  But for Defendant's actions, Payne's landlord would not have terminated her lease.

140.  APD and CAT officer communications with the landlords of Plaintiffs Williams, Scott and Coleman, containing unsupported allegations that Plaintiffs had engaged in criminal and/or unlawful activity on the premises and threatening landlords with civil and criminal liability if they continue to rent to Plaintiffs were and are attempts to induce these landlords to terminate the leases and procure breaches by the landlords of the covenant of good faith and fair dealing owed to Plaintiffs.

141.  As a direct and proximate cause of Defendant's actions, the performance of Plaintiffs Williams, Scott and Coleman under their leases was made more burdensome or costly.

1

## RELIEF ALLEGATIONS

2

142.  Plaintiffs incorporate by reference the allegations set forth in the paragraphs above.

3

143.  Defendant's conduct described above is ongoing and will continue to occur unless

4

restrained and enjoined by this Court.

5

144.  A dispute exists between Plaintiffs and the class they represent and Defendant as to

6

their respective duties under the Fourth and Fourteenth Amendments to the United States

7

Constitution; Fair Housing Act; 42 U.S.C. § 1983; California Constitution article I, sections 7

8

and 13; California Government Code § 11135 and its implementing regulations; the California

9

Fair Employment & Housing Act; and the Bane Act and as to whether Defendant's actions

10

violated, and continues to violate, any of these laws.  Plaintiffs and the class they represent

11

therefore seek judicial declarations setting forth their respective rights and duties under these

12

laws.

13

145.  Defendant's actions described in the paragraphs above violate the Fourth and

14

Fourteenth Amendments to the United States Constitution; Fair Housing Act; 42 U.S.C. § 1983;

15

California Constitution article I, section 7 and 13; California Government Code § 11135 and its

16

implementing regulations; the California Fair Employment & Housing Act; and the Bane Act.

17

Defendant will continue these policies and practices and will directly affect each individual

18

Plaintiff and the class they represent unless enjoined by this Court.

19

146.  Plaintiffs and the class they represent have no plain, speedy, or adequate remedy at

20

law to redress the violations alleged herein, and the injunctive relief sought in this action is the

21

only means of securing complete and adequate relief.  Plaintiffs and the class they represent are

22

now suffering and will continue to suffer irreparable injury from Defendant's discriminatory acts

23

and omissions.

24

147.  Plaintiffs are indigent, and if an injunction issues the Court should waive the

25

posting of bond.

26

27

148.  As a direct and proximate cause of Defendant's actions, Plaintiffs Williams, Scott, Coleman, Bunton and Payne have suffered damages in an amount according to proof, including emotional distress, loss of security, and out-of-pocket expenses.

WHEREFORE, Plaintiffs pray that the Court:

1.  Certify this action as a class action on behalf of all African-Americans who have held, currently hold, may hold, or are erroneously regarded by the City and officers of the Antioch Police Department as holding, Section 8 housing vouchers, and all members of their households who reside, have resided or will reside, in the City Antioch; and designate Plaintiffs as representatives of the class and their counsel of record as Class Counsel;

2.  Issue a preliminary and permanent injunction against Defendant and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, prohibiting them from:

   a.  Disproportionately targeting class members for criminal investigation on a basis differently from similarly situated non class members;

   b.  engaging in, or seeking to engage in, unlawful and pretextual searches of the homes of class members;

   c.  handling disturbance or nuisance complaints concerning Section 8 households differently from non-Section 8 households;

   d.  communicating, in writing or otherwise, false or unlawfully obtained information of criminal and nuisance activity about class members to the Housing Authority of the County of Contra Costa or to class members' landlords;

   e.  engaging in communications, written or otherwise, to class members' landlords for the purpose of causing class members' eviction;

   f.  soliciting complaints about class members from their neighbors and others;

3.    Issue a judicial declaration that Defendant's actions as alleged in this complaint violate the Fourth and Fourteenth Amendments to the United States Constitution; Fair Housing Act; 42 U.S.C. § 1983; California Constitution article I, sections 7 and 13; California Government Code § 11135 and its implementing regulations; the California Fair Employment & Housing Act; and the Bane Act;

4.    Provide for statutory minimum damages on behalf of the class, pursuant to California Civil Code § 52;

5.    Provide for compensatory, special and statutory damages on behalf of the individual Plaintiffs, according to proof, said damages to be trebled pursuant to Civil Code § 52;

6.    Provide for pre-judgment and post-judgment interest to the extent permitted by law;

7.    Provide for costs and expenses of the suit incurred herein, including reasonable attorneys' fees to the extent available by law; and

8.    Provide for such other and further legal and equitable relief as this Court deems necessary, just and proper.

**Demand for Jury Trial**

In accordance with Fed. R. Civ. P. Rule 38(b), and Northern District Local Rule 3-6, Plaintiffs hereby demand a jury trial on all issues triable by jury.

DATED:  July 16, 2008

By _____
Brad Seligman (State Bar No. 083838)
bseligman@impactfund.org
Jocelyn D. Larkin (SBN 110817)
Alvaro D. Soria (SBN 247532)
IMPACT FUND
125 University Ave., Suite 102
Berkeley, CA 94710
Telephone: (510) 845-3473
Facsimile: (510) 845-3654

Oren M. Sellstrom (SBN 161074)
osellstrom@lccr.com
Kendra Fox-Davis (SBN 248757)
Charles Forster (SBN 252826)
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO BAY
AREA
131 Steuart St., Suite 400
San Francisco, CA  94105
Telephone: (415) 543-9444
Facsimile: (415) 543-0296

Alan L. Schlosser (SBN 49957)
aschlosser@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm St.
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

Richard A. Marcantonio (SBN 139619)
Rmarcantonio@publicadvocates.org
Michelle Natividad Rodriguez (SBN
226683)
PUBLIC ADVOCATES, INC.
131 Steuart St., Suite 300
San Francisco, CA 94105
Telephone: (415) 431-7430
Facsimile: (415) 431-1048

Attorneys for Plaintiffs and the Proposed
Class