Impact Fund
BRAD SELIGMAN (SBN 083838)
bseligman@impactfund.org
JOCELYN D. LARKIN (SBN 110817)
125 University Avenue, Suite 102
Berkeley, CA  94710
Telephone:  510.845.3473
Facsimile:  510.845.3654

Bingham McCutchen LLP
FRANK B. KENNAMER (SBN 157844)
ABIGAIL C. SLONECKER (SBN 252452)
abigail.slonecker@bingham.com
Three Embarcadero Center
San Francisco, CA  94111
Telephone:  415.393.2000
Facsimile:  415.393.2286

Attorneys for Plaintiffs SANTEYA DANYELL
WILLIAMS, MARY RUTH SCOTT, KAREN
LATREECE COLEMAN, PRISCILLA BUNTON, and
ALYCE DENISE PAYNE

**Additional Counsel Listed After Signature Page**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANTEYA DANYELL WILLIAMS, MARY RUTH SCOTT, KAREN LATREECE COLEMAN, PRISCILLA BUNTON, and ALYCE DENISE PAYNE, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF ANTIOCH,<br><br>Defendant. | No. C-08-2301 SBA<br><br>**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND SUPPORTING POINTS AND AUTHORITIES**<br><br>Date:  January 12, 2010<br>Time:  1:00 p.m. |

# TABLE OF CONTENTS

Page

NOTICE OF MOTION ................................................................................................. 1

INTRODUCTION ....................................................................................................... 1

FACTUAL STATEMENT ........................................................................................... 2

LEGAL ARGUMENT ................................................................................................. 19

    A.    Proposed Class Definition ................................................................... 20

    B.    All Requirements of Rule 23(a) Are Satisfied ................................... 20

        1.    The Proposed Class is Sufficiently Numerous .......................... 20

        2.    The Class Shares Common Questions of Law and Fact ............ 21

        3.    The Named Plaintiffs' Claims Are Typical ............................... 22

        4.    The Named Plaintiffs are Adequate Class Representatives ...... 22

    C.    Plaintiffs Meet the Requirements of Rule 23(b) ................................. 23

        1.    The Court Should Certify the Class Under Rule 23(b)(2) ......... 23

        2.    Alternatively, the Court Could Certify the Class under Rule 23(b)(3) or Use Hybrid Certification ........................................ 24

    D.    Appointment of Class Counsel ........................................................... 25

CONCLUSION ........................................................................................................... 25

1

## TABLE OF AUTHORITIES

2

Page

3

**CASES**

4

*Amchem Products, Inc. v. Windsor,*
5      521 U.S. 591 (1997) .......................................................................................... 23

6

*Arnold v. Arizona Dep't of Public Safety,*
     2006 WL 2168637 (D. Ariz. July 31, 2006) ........................................................ 20

7

*Arnold v. United Artists Theatre Circuit, Inc.,*
8      158 F.R.D. 439 (N.D. Cal. 1994) ....................................................................... 23

9

*Barefield v. Chevron, U.S.A., Inc.,*
     1988 WL 188433 (N.D. Cal. Dec. 6, 1988) .................................................. 23, 24

10

11

*Botosan v. Paul McNalley Realty,*
     216 F.3d 827 (9th Cir 2000) .............................................................................. 24

12

*Californians for Disability Rights, Inc. v. Cal. Dep't of Transp.,*
13      249 F.R.D. 334 (N.D. Cal. 2008) ............................................................ 19, 20, 21

14

*Darensburg v. Metro. Transp. Comm'n,*
     611 F. Supp. 2d 994 (N.D. Cal. 2009) ............................................................... 18

15

16

*Eisen v. Carlisle & Jacquelin,*
     417 U.S. 156 (1974) .......................................................................................... 19

17

*Gen. Tel. of the Southwest v. Falcon,*
18      457 U.S. 147 (1982) ...................................................................................... 19, 22

19

*Hanlon v. Chrysler Corp.,*
     150 F.3d 1011 (9th Cir. 1998) ........................................................................... 23

20

*Hanon v. Dataproducts Corp.,*
21      976 F.2d 497 (9th Cir. 1992) ............................................................................. 20

22

*Hickey v. City of Seattle,*
     236 F.R.D. 659 (W.D. Wash. 2006) .................................................................. 20

23

24

*Hnot v. Willis Group Holding,*
     241 F.R.D. 204 (S.D.N.Y. 2007) ...................................................................... 21

25

*Int'l Molders & Allied Workers' Local Union No. 164 v. Nelson,*
26      102 F.R.D. 457 (N.D. Cal. 1983) ...................................................................... 20

27

*Kincaid v. City of Fresno,*
28      244 F.R.D. 597 (E.D. Cal. 2007) ...................................................................... 20

1

TABLE OF AUTHORITIES
(continued)

2

Page

3

*Ledford v. City of Highland Park,*
4     2000 WL 1053967 (N.D. Ill. Jul. 31, 2000)................................................................ 20

5

*Lehr v. City of Sacramento,*
      2009 WL 2590628 (E.D. Cal. Aug. 21, 2009) ............................................... 20, 24
6

7

*Mathers v. Northshore Mining Co.,*
      217 F.R.D. 474 (D. Minn. 2003)................................................................................ 24

8

*Molski v. Gleich,*
      318 F.3d 937 (9th Cir. 2003)...................................................................................... 24
9

10

*Parra v. Bashas' Inc.,*
      536 F.3d 975 (9th Cir. 2008)...................................................................................... 21

11

*Pfaff v. HUD,*
12     88 F.3d 739 (9th Cir. 1996)........................................................................................ 18

13

*Robinson v. Metro-North Commuter R.R.,*
      267 F.3d 147 (2d Cir. 2001)....................................................................................... 24
14

15

*Sisemore v. Master Fin., Inc.,*
      151 Cal. App. 4th 1386 (2007) ................................................................................. 18

16

*Staton v. Boeing,*
17     327 F.3d 938 (9th Cir. 2003)................................................................................. 19, 22

18

*The Comm. Concerning Cmty. Improvement v. City of Modesto,*
      2009 WL 3208728 (9th Cir, Oct. 8, 2009) ............................................................... 18
19

20

*Village of Arlington Heights v. Metro. Hous. Dev. Corp,*
      429 U.S. 252 (1977).................................................................................................... 19

21

**STATUTES**

22

42 U.S.C. § 1983 ................................................................................................................ 19

23

42 U.S.C. § 3617 ................................................................................................................ 18

24

Cal. Civ. Code §§ 52(a) & 52.1(b)................................................................................... 19

25

Cal. Gov't Code § 11139 ................................................................................................... 19

26

Cal. Gov't Code § 11135 ............................................................................................. 18, 19

27

Cal. Gov't Code § 12955(d),(g) & (k), (p)(1)................................................................. 18

28

iii

1

TABLE OF AUTHORITIES
(continued)

2

Page

3

Cal. Gov't Code §12955.7, §12955.8(b)...................................................................... 18

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION**

On January 12, 2010 at 1 p.m., in Courtroom 1, before the Honorable Saundra Brown Armstrong, United States District Court, 1301 Clay Street, Suite 400, Oakland, CA. 94612, Plaintiffs will move for order certifying the following class under Federal Rule of Civil Procedure 23(b)(2):  all African Americans who have held, currently hold, may hold, or are erroneously regarded by the City and officers of the Antioch Police Department as holding, Section 8 housing vouchers, and all members of their households, who reside, have resided or will reside, in the City of Antioch.

**INTRODUCTION**

In recent years, the City of Antioch has experienced an increase in the number of residents renting homes with the help of Section 8 federal housing assistance.  Many of these residents are African-American.  In 2006, a vocal group of homeowners unleashed a political "firestorm" of protest about these newcomers.  They objected to Section 8 tenants living in "luxury" homes in their neighborhoods and blamed them for a perceived increase in crime.  As one like-minded City Councilperson exclaimed, "We're not going to let our city become Richmond . . . we're not going to stand by and let Antioch go to hell."

In response to the public scapegoating, Antioch officials established the Community Action Team (CAT), a police task force which was given a broad mandate to combat "problem houses."  Although fewer than 6% of Antioch households are Section 8 recipients, they became the main focus of the CAT unit.  Enlisting the help of an outspoken anti-Section 8 group, CAT officers eschewed their traditional law enforcement role in favor of ferreting out potential Section 8 lease violations or nuisance allegations.  CAT officers then used this information to press the Housing Authority to revoke Section 8 vouchers and to frighten landlords into evicting their tenants.  This focus on Section 8 had a predictable and substantial impact on African-American Section 8 households:  more than two-thirds of the Section 8 families targeted by CAT were African-American.

On behalf of themselves and similarly situated class members, the Plaintiffs, five African-American mothers and Section 8 recipients, contend that CAT targeted African-

American Section 8 recipients for undue scrutiny and harassment, violating their federal and state fair housing and constitutional rights.  They allege race discrimination based upon theories of both disparate impact (where no intent need be proven) and disparate treatment (where proof of intent is required).  Plaintiffs also allege that these actions violate a state law prohibition on discrimination based on "source of income," which requires no proof of race discrimination, intentional or otherwise.

Plaintiffs now move to certify a class action under Federal Rule of Civil Procedure 23(b)(2) on behalf of African-American Section 8 recipients in Antioch.  This motion does not require the Court to address the merits of plaintiffs' claims, but rather to determine whether plaintiffs have alleged common policies or practices that are suitable for class treatment.  Since plaintiffs brought this case to obtain injunctive relief to change the practices of the Antioch police, the case should be certified under Rule 23(b)(2).  These class members are living in poverty and struggling to provide a decent life for their families.  A class action is the only practical means of ensuring their right to be left alone without the constant threat of police harassment.

## **FACTUAL STATEMENT**

<u>Section 8 Rentals in Antioch</u> – Many single family homes in Antioch became available for rent in recent years. Larkin Decl., Ex. 1 (Gilbert Dep. 61:16 – 62:2).  Some homeowners chose to rent to families in the Department of Housing and Urban Development (HUD) Section 8 Housing Choice Voucher Program.  *Id.*, Ex. 16 (11/14/06 Tamayo Rpt. to Bd. of Commissioners).  The voucher program allows low-income families to lease a home on the private rental market.  Eligible families pay no more than 40% of their income in rent, and the voucher covers the remainder up to a HUD-established Fair Market Rent cap.  *Id.*  The Housing Authority of the County of Contra Costa (the "Housing Authority") administers the Section 8 program.  *Id.*, Ex. 2 (Tamayo Dep. 15:9–16:1).  Because of the availability of affordable rentals, the number of Section 8 units in Antioch increased.  *Id.*, Ex. 1 (Gilbert Dep. 60:12–25).  From

1    2006–2009, there were 1,902 voucher recipients in Antioch, a majority of whom (55.8 %) were

2    African American.  Krisberg Decl. at 12:13–15.[1]

3        <u>Public Scapegoating of Section 8 Participants</u> – In mid-2006, a group of Antioch

4    residents began to raise objections to Section 8 tenants whom they perceived were undermining

5    the city's "quality of life."  They organized under the name 'United Citizens for Better

6    Neighborhoods' (UCBN) with the avowed purpose of "combat[ing] problems associated with

7    Section 8 rentals."  Larkin Decl., Ex. 17 (UCBN Mission Statement).  In June 2006, the group's

8    leader, Gary Gilbert, demanded that the mayor put the issue of Section 8 on the next City

9    Council agenda.  *Id.*, Ex. 18 (6/23/06 Freitas-Gilbert E-Mail).  "This issue has created a

10   'firestorm' in this community and the people of Antioch want to be heard."[2]  *Id.*  City Manager

11   James Jakel acknowledged that the city was under pressure to respond to the "firestorm" about

12   Section 8 rentals, which had become a political issue.  *Id.*, Ex. 3 (Jakel Dep. 20:1–18, 24:7–11,

13   37:19–38:11).

14       At City Council meetings and a series of Council-sponsored "quality of life" forums,

15   Section 8 recipients were blamed for many of the City's problems.  Larkin Decl., Ex. 19 (9/26/06

16   Tamayo Rpt. to Board of Commissioners).  Some of the public discourse expressed overtly racist

17   views about African Americans.  *Id.*, Ex. 4 (Freitas Dep. 101:10–23, 112:14–23); *Id.*, Ex. 5

18   (Simonsen Dep. 43:4–8, 83:11–15); *Id.*, Ex. 20 (4/15/07 "Death of Antioch" Citizen E-Mail).  City

19   Council members Simonsen and Kalinowski made racially coded comparisons to Richmond, a

20   city with a higher concentration of African Americans and a higher crime rate. Dang Decl. ¶ 10.

21   "We're not going to let our city become Richmond…we're not going to stand by and let Antioch

22   go to hell." *Id.* at ¶ 10(d).[3]  Antioch's mayor publicly bemoaned the fact that the city had more

23

24

25

26

27

28

---

[1]    Barry Krisberg, plaintiffs' statistical expert, is the President of the National Council on Crime and Delinquency, the nation's oldest criminal justice research organization.  Krisberg Decl. at 1:11-12.  Dr. Krisberg analyzed statistical data provided in discovery from the Antioch Police Department and the Housing Authority.

[2]    Gary Gilbert, who is African American, is a former employee of the Housing Authority of Contra Costa County.  Larkin Decl., Ex. 1 (Gilbert Dep. 16:14 – 17:1).

[3]    Former Police Chief Mark Moczulski testified that he believed such remarks were stereotypes "directed at the Black community."  Larkin Decl., Ex. 7 (Moczulski Dep 96:18-97:13).

1   than its "fair share" of Section 8 tenants.  Larkin Decl., Ex. 4 (Freitas Dep. 37:12–16; 50:23–

2   52:13 ("We think we're taking the lion's share.  We don't like it")); Dang Decl. ¶ 10(a).

3          Public officials and opponents complained vociferously that Section 8 tenants should not

4   be allowed to rent "luxury" homes in nice neighborhoods.  Larkin Decl., Ex. 21 (4/15/07

5   "Luxury Homes" Citizen E-mail); *Id.*, Ex. 22 (6/13/07 "Luxury Homes" Citizen Petition); *Id.*,

6   Ex. 5 (Simonsen Dep. 27:17–20); *Id.*, Ex. 4 (Freitas Dep. 58:1–61:24).  The Housing Authority

7   explained to city officials that the Section 8 voucher program permits participants to use their

8   vouchers to rent single-family homes at fair market value and that it did not control which homes

9   or neighborhoods the voucher recipient selected.  Councilman Simonsen nonetheless condemned

10  Section 8 tenants living in homes with pools and publicly exhorted the Housing Authority not to

11  follow federal regulations.  "Here's a chance for the housing authority to do a little civil

12  disobedience.  Defy the rules of HUD.  Defy the rules of the state…" *Id.*, Ex. 5 (Simonsen Dep.

13  29:21–31:6); Dang Decl. ¶ 10(b).

14         The city's newly-hired police chief, James Hyde, likewise expressed his disapproval of

15  "issuing Section 8 vouchers to luxury homes," even though he understood that it was not a law

16  enforcement concern.  *Id.*, Ex. 6 (Hyde Dep. 162:1–164:1); *Id.*, Ex. 23 (2/23/07 News Article on

17  Hyde Presentation); *Id.*, Ex. 24 (10/19/06 Hyde-Jakel E-mail).[4]  Chief Hyde nevertheless added

18  further fuel to the fire with a public presentation in which he showed photographs of large

19  homes, each described as having an "approximate market value of one million dollars," where

20  Section 8 tenants purportedly lived.  *Id.*, Ex. 25 (1/27/07 Hyde Quality of Life Presentation).

21  One slide was entitled "Section 8 Fraud Facts." *Id.*[5]

22  _____

23  [4]       Former Police Chief Mark Moczulski testified that it was *not* the role of the Antioch
    police to proactively investigate HUD violations or alleged Section 8 fraud, any more than it
24  would be for it to investigate violations of homeowner association rules.  Larkin Decl., Ex. 7
    (Moczulski Dep. 70:2–24).
    [5]       Other senior police officials held strong political views about who should live in Antioch
25  and the Section 8 program.  Memo after memo focused on the fact that Section 8 recipients
    should not be occupying expensive properties, even though it was not a violation of Section 8
26  rules. Larkin Decl., Ex. 31 (10/17/06 McConnell-Jakel E-Mail); *Id.*, Ex. 24 (10/19/06 Hyde-
    Jakel E-Mail re: Early Retirement).  Captain Stephen McConnell vented his personal opinions
27  about the Section 8 program and described a landlord willing to rent a large single family home
    to a Section 8 recipient as a "slumlord." *Id.*, Ex. 8 (McConnell Dep. 82:8 – 83:22).

28

                                        4

Chief Hyde displayed a map of the city at this public presentation, with marks indicating which homes were Section 8 rentals, and described the "overconcentration of Section 8 voucher property or problem property" in the higher-income Southeast area (94531 zip code). *Id.*, Ex. 26 (1/27/07 Hyde Presentation (including map of Section 8 residents concentration in Antioch)); Larkin Decl., Ex. 6 (Hyde Dep. 179:25–180:20). The Southeast (zip code 94531) is comprised of newer, single-family homes, where the median household income is $102,943. *Id.*, Ex. 27 (9/26/06 Housing Auth. Powerpoint). In contrast, the older Northwest (94509) contains the downtown, where Antioch's highest-crime areas are located. *Id.*, Ex. 28 (June 2009 Antioch "Person Crime" Map); *Id.*, Ex. 8 (McConnell Dep. 177:22–179:25); *Id.*, Ex. 2 (Tamayo Dep. 47:2–48:5). The median household income in 94509 is just $58,285. *Id.*, Ex. 27 (9/26/06 Housing Auth. Powerpoint). Most Section 8 recipients live in the 94509 zip code. Of those who live in the 94531 zip code, however, nearly 75% are African-American. Dang Decl. ¶ 5(d).

Many, including UCBN's leader, publicly blamed the influx of Section 8 tenants for a perceived increase in crime. Larkin Decl., Ex. 29 (11/18/06 Gilbert Contra Costa Times Op-Ed); Larkin Decl., Ex. 4 (Freitas Dep. 35:11–15). In fact, the city had no evidence, then or now, that any increase in crime in Antioch was linked to the Section 8 influx. *Id.*, Ex. 6 (Hyde Dep. 32:21–33:8); *Id.*, Ex. 4 (Freitas Dep. 86:8–88:20, 120:15–121:3); *Id.,* Ex. 67 (Def. Interr. Responses, No. 15). Rather than quell public hysteria, Chief Hyde made a public presentation that expressly linked Section 8 tenants and crime, based on a few anecdotes. *Id.*, Ex. 25 (1/27/07 Hyde Quality of Life Presentation). Public officials declared the city's "zero tolerance for Section 8 participants criminal *and other noncompliant behaviors*." *Id.*, Ex. 30 (10/23/06 City Officials-HUD Mtg. Notes) (emphasis added). One Section 8 recipient who attended a Quality of Life Forum in July 2007 observed that a number of citizens were "angry and hostile towards Section 8. . .blaming Section 8 for all of the City's problems" and that city officials and the police chief appeared to agree with this perception. Alexander Decl. ¶ 12; *see also* Glasper Decl. ¶¶ 6–7.

The United Citizens for Better Neighborhoods began to compile a list of the addresses where Section 8 vouchers had been or would be accepted and made the list available on its

1  website.  Larkin Decl., Ex. 1 (Gilbert Dep. 83:12–23).  Signs appeared on the doors of some

2  renters stating: "No more Rentals.  No More Section 8.  Save Antioch NOW.  We THE

3  RESIDENTS are watching YOU."  *Id.*, Ex. 32 (Anti-Section 8 Flyer); *Id.*, Ex. 2 (Tamayo Dep.

4  59:10 – 60:10); Rogers Decl. ¶ 6 (anti-Section 8 flyer posted on African-American neighbor's

5  door).

6          As one possible solution, officials sought to limit the number of Section 8 recipients

7  allowed to live in Antioch, but were told by the Housing Authority and HUD that this could not

8  be done.  Larkin Decl., Ex. 3 (Jakel Dep. 38:20–39:25); *Id.*, Ex. 6 (Hyde Dep. 141:2–14).  The

9  city turned, instead, to its police force to accomplish this purpose.

10         <u>The Community Action Team</u> – In response to the public "firestorm" against Section 8

11 recipients, the city established CAT in July 2006.  *Id.*, Ex. 4 (Freitas Dep. 96:20–24); *Id.*, Ex. 1

12 (Gilbert Dep. 64:12–15).  Initially named the "Problem Housing Unit," CAT is comprised of

13 four full-time officers (one sergeant, one corporal and two officers).  *Id.*, Ex. 33 (11/28/06

14 McConnell Memo).  CAT has never had an African-American officer.  *Id.*, Ex. 9 (Schwitters

15 Dep. 157:17–158:10).

16         CAT is intended to be a "stand-alone" unit, which is "proactive," "self-initiating" and

17 "autonomous."  *Id.*, Ex. 10 (McConnell 30(b)(6) Dep. 102:1–18).  There is no policy or

18 definition of what constitutes a "CAT case."  *Id.* (McConnell 30(b)(6) Dep. 64:10–19).  Instead,

19 CAT officers are given virtually unlimited discretion, based on their "common sense," to select

20 which locations to investigate and how to conduct those investigations. *Id.* (McConnell 30(b)(6)

21 Dep. 64:20–65:2); Larkin Decl., Ex. 6 (Hyde Dep. 48:10–19, 56:17–22, 103:16–104:1).

22         <u>CAT Targets Section 8</u> – From its inception, the majority of CAT's work and resources

23 has been dedicated to the investigation of Section 8 homes.  Larkin Decl., Ex. 25 (1/27/2007

24 Hyde Quality of Life Presentation (63% of 2006 CAT cases are Section 8)); *Id.*, Ex. 34 (7/12/07

25 Schwitters-McConnell E-Mail (Between July 2006 to June 2007, 66-71% of CAT cases are

26 Section 8)); *Id.*, Ex. 33 (11/28/06 McConnell Memo (high percentage of CAT resources devoted

27 to Section 8)).  In community meetings, the Police Chief highlighted CAT's focus on Section 8

28 cases.  *See, e.g.*, Larkin Decl., Ex. 25 (1/27/07 Hyde Quality of Life Pres.).  A CAT officer

1   confirmed that Section 8 problem houses "are getting our utmost attention right now."  Larkin

2   Decl., Ex. 35 (9/4/06 Dillard-Gilbert E-Mail).

3        Statistical data confirms CAT's focus on Section 8:  in its first year of operation, 58% of

4   CAT targets were Section 8, even though only 4.7% of Antioch households were Section 8.

5   Among rental locations targeted by CAT, an astonishing 76.7% were Section 8.  Krisberg Decl.

6   at 8: 3–6.  Over the entire period of 2006–09, nearly two-thirds of the rental units targeted by

7   CAT were Section 8.  *Id.* at 10: 2–5.  Section 8 households in the wealthier zip code were three

8   times as likely to be designated as a CAT house than those in the poorer zip code, even though

9   the high crime areas were in the poorer zip code.  Larkin Decl., Ex. 8 (McConnell Dep. 177:25–

10  178:15); *Id.*, Ex. 28 (Antioch June 2009 "Person Crime" Map, Ex. 28); *Id.*, Ex. 11 (Bittner Dep.

11  121:22–122:14); Krisberg Decl. at 18:6–8.

12       <u>CAT Written Policies</u> – CAT procedures are set forth in the "C.A.T. Case Flow Chart,"

13  which documents how CAT targeted and investigated Section 8 homes.  Larkin Decl., Ex. 36

14  (C.A.T. Case Flow Chart).[6]  At the intake phase, CAT officers determine ownership status of the

15  property, including whether it is "HUD," *i.e.*, Section 8.  *Id.*  At the investigation stage, officers

16  are to make contact with neighbors or leave door hangers, and contact the local HUD office to

17  "confirm if target location is receiving section 8 assistance and who the authorized residents

18  are." *Id.*  Then, at the enforcement stage, officers are to contact the target resident and "[u]se this

19  initial contact to gather information about any and all residents in the household for possible use

20  of unauthorized residency through section 8 or landlord tenant agreements. . . ."  *Id.*  An "offense

21  report" is to be made "for any target locations which are section 8 subsidized which are in

22  violation of law or section 8 rules," and the information is to be turned over to HUD

23  "documenting any and all violations of law or section 8 rules."  *Id.*  The evidence demonstrates

24  that CAT officers closely followed this playbook.

25       *Determination of Section 8 Status* – Consistent with the Flow Chart, Antioch police

26  ─────────────────────
    [6]     Chief Hyde reviewed and approved this Flow Chart, which is used to train new officers.

27  Larkin Decl. Ex. 67 (Defendant's Interr. Responses, No. 6 at 6); Larkin Decl., Ex. 67 (Hyde Dep.
    42:25-43:20, 47:25-48:2); *Id.*, Ex. 10 (McConnell 30(b)(6) 62:18-63:10)**.**

28

actively sought to determine which residents were on Section 8.  Larkin Decl., Ex. 9 (Schwitters Dep. 60:9–16, 61:3–19); Larkin Decl., Ex. 6 (Hyde Dep. 57:1–25).  Antioch police and city officials repeatedly pressed the Housing Authority to provide a complete list of all Section 8 recipients in Antioch.  Larkin Decl., Ex. 2 (Tamayo Dep. 65:21–66:10). Answer to First Amended Complaint ¶ 11. County counsel ultimately determined that the Housing Authority could not legally release the list.  Larkin Decl., Ex. 37 (6/4/07 Schwitters-Hildebrand E-Mail); Larkin Decl., Ex. 38 (12/18/07 County Counsel Letter).[7]  By then, CAT had developed other tactics for obtaining this information.  CAT officers asked residents, homeowners and neighbors directly if the resident was a Section 8 recipient.  Larkin Decl., Ex. 9 (Schwitters Dep. 61:1–19); T. Thomas Decl. ¶ 7; D. Rogers Decl. ¶ 7; Day-Bennett Decl. ¶ 7;  Alexander Decl. ¶¶ 6, 8; L. Thomas Decl. ¶ 5.  They obtained records of water and garbage service for the property and cross-referenced them with their "section 8 lists."  Larkin Decl., Ex. 39 (Sept. 2006 C.A.T. Highlights).  They created a large map of Section 8 properties that was maintained in the CAT office.  *Id.*, Ex. 9 (Schwitters Dep. 263:5–23).

*Solicitation of Neighbor Complaints* – City officials and the police, working closely with UCBN, encouraged neighbors to submit complaints about Section 8 residents, either to CAT for investigation or directly to the Housing Authority.  Larkin Decl., Ex. 40 (7/11/06 Antioch City Council Meeting Minutes). UCBN leader Gary Gilbert was in regular communication with CAT officers, transmitting numerous complaints against Section 8 tenants.  *Id.*, Ex. 41 (4/28/08 Schwitters-Gilbert E-Mail); *Id.*, Ex. 42 (8/9/06 Gilbert-Bittner E-Mail); *Id.*, Ex. 6 (Hyde Dep. 271:21–272:17); *Id.*, Ex. 12 (Cantando Dep. 58:22–59:10).  In turn, CAT officers reported back to Gilbert the results of their Section 8 investigations, with instructions to share the news with other UCBN members.  *Id.*, Ex. 35 (9/4/06 Dillard-Gilbert E-Mail); *Id.*, Ex. 6 (Hyde Dep. 272:18–273:11).  In an e-mail to Gilbert, a CAT officer disclosed the details of several on-going investigations and encouraged Gilbert to "keep the e-mails coming."  *Id.*, Ex. 35 (9/4/06 Dillard-

---

[7]     The Housing Authority Director feared that, with the complete list, Section 8 tenants would be "targeted" by CAT, and "they would be additional pins put on a board that the Antioch Police Department had."  Larkin Decl., Ex. 2 (Tamayo Dep. 68:2-9).

Gilbert E-Mail).  The head of the CAT unit gave Gilbert his personal cell phone number and encouraged him to "never hesitate to call me or email me."  *Id.*, Ex. 41 (4/28/08 Schwitters-Gilbert E-Mail).  Antioch officers and staff also frequently referred matters to CAT for investigation when they suspected that the tenants were on Section 8.  *Id.*, Ex. 43 (3/9/07 Rezentes-Bittner E-Mail); *Id.*, Ex. 44 (10/9/07 Bias-Schwitters E-Mail); *Id.*, Ex. 45 (12/14/06 Schwitters E-Mail to APD).

CAT officers also placed door hangers on the front doors of the neighbors of suspected targets, asking them to call to discuss "quality of life" issues on the street.  Larkin Decl., Ex. 46 (APD Door Hanger);  *Id.*, Ex. 30 (10/23/06 Notes from Antioch City Council Meeting with HUD ("Door hangers are used in problem areas asking neighbors to report neighborhood concerns."));  *Id.*, Ex. 47 (C.A.T. Monthly Reports July 2006–June 2008, at D0014569 (CAT reports door hangers are "[g]reat P.R. and communication tools.")).  *See also* L. Thomas Decl. ¶ 12 (neighbors told by officers that declarant was Section 8 and should call with complaints).

In response to this encouragement, citizens sent complaints to the police, noting explicitly that the tenants were or might be Section 8 recipients.  CAT would then investigate to confirm Section 8 status.  *See, e.g.*, Larkin Decl., Ex. 48 (7/10/07 Bias-McConnell E-Mail); *Id.*, Ex. 49 (9/26/06 Bittner Event Report).

The neighbor complaints often had little to do with suspected criminal activity, but instead objected to barking dogs, loud music or unkempt lawns.  Rogers Decl. ¶ 5 (grass too long and car parked improperly); L. Thomas Decl. ¶ 10 (loud music and broken bottles); Bunton Decl. ¶ 5 (teenage son playing basketball in the evening); Williams Decl. ¶ 6 (barking dogs).  One UCBN member complained in an e-mail to CAT about "George," an African-American 6th grader who misbehaved at the pool and advised CAT to "put this family on your radar list.  Nothing criminal yet, but they have potential."  Larkin Decl., Ex. 50 (6/12/08 Gilbert E-Mail); Dang Decl. ¶ 9.  Another neighbor objected that the owner of an empty home on her street was making the home available for Section 8 rentals and beseeched the city to prevent any Section 8 tenant from moving in.  "These beautiful homes end up being rented to unscreened, disrespectful, and other criminal tenants and ruin the homes and the surrounding

9

neighborhoods." Larkin Decl., Ex. 51 (2/16/07 Hyde E-Mail Re: Citizen Complaint). Despite the fact that the complaint raised no criminal or nuisance conduct and was empty, CAT investigated it. *Id.*

CAT also assisted citizens in submitting complaints about Section 8 tenants directly to the Housing Authority, with hard copy forms and a link on their website. Larkin Decl., Ex. 52 (C.A.T. Webpage); *Id.*, Ex. 53 (8/9/06 Schwitters-APD E-Mail Re: Section 8 Citizen Complaint Forms). A Housing Authority official familiar with these complaints testified that the police encouraged residents to submit complaints about anything they found bothersome. *Id.*, Ex. 65 (Tuggles McNab Dep. 103:10–21). These included a complaint that a Section 8 tenant had Christmas tree lights on the home, and another caller who wanted a curfew for Section 8 recipients. *Id.*, Ex. 65 (Tuggles McNab Dep. 102:3–11). The majority of the citizen complaints to the Housing Authority came from the wealthier 94531 area code. *Id.*, Ex. 2 (Tamayo Dep. 48:6–10, Ex. 2).

*Use of Domestic Violence Incidents* – CAT also used Section 8 tenants' own calls for help to the police as an opportunity to build a case for Section 8 violations. *See e.g.* Williams Decl. ¶ 9. Plaintiff Alyce Payne made calls to the police for incidents of domestic violence, and evidence collected in those calls then became the basis for CAT's referral of Payne to the Housing Authority. Payne Decl. ¶¶ 5–6, 8, 10 & Exh. B. The Housing Authority declined to proceed with termination because federal regulations prohibit revocation arising from domestic violence. Larkin Decl., Ex. 2 (Tamayo Dep. 91:11–92:1). CAT officers conceded that they were aware that incidents of domestic violence were not grounds for revoking the Section 8 assistance of the victim. *Id.*, Ex. 9 (Schwitters Dep. 283: 9–18); *Id.*, Ex. 11 (Bittner Dep. 255: 3–21). Nonetheless, they submitted revocation referrals to the Housing Authority for these women, *without* informing the agency that the tenants were domestic violence victims. *Id.* (Bittner Dep. 300:2–304:18).

*Home Searches* – CAT routinely used warrantless home visits and searches to target class members and build a case for revocation against Section 8 tenants. Larkin Decl., Ex. 13 (Bias Dep. 117:20–118:3). CAT has never obtained a single search warrant for *any* of the hundreds of

10

1    investigations that it has conducted. *Id.*, Ex. 10 (McConnell 30(b)(6) Dep. 118:2–25). Instead,

2    the officers often assert that Section 8 tenants "consent" to a search or conduct parole/probation

3    searches.[8] *See* Williams Decl. ¶¶ 10–11; Scott Decl. ¶¶ 10, 12; K. Coleman Decl. ¶¶ 15–20, 23;

4    Bunton Decl. ¶¶ 6–7, 11; Taylor Decl. ¶¶ 5–12 (after repeated unsuccessful visits to find

5    evidence of unauthorized resident, CAT conducted a 5 a.m. "parole" search although parolee did

6    not live with declarant and was not at the resident's home); T. Thomas Decl. ¶¶ 7, 9 (probation

7    search of car and of home to find unauthorized residents); Threets Decl. ¶ 6 (declarant subjected

8    to unauthorized home search); Alexander Decl. ¶ 13 (family handcuffed and subjected to home

9    search by SWAT team with machine guns, officers later admitted it was the wrong address); L.

10   Thomas Decl. ¶ 6 (police falsely told declarant they could search because she was on Section 8,

11   then proceeded to do so); Gray Decl. ¶¶ 6–25.

12       *CAT Referrals to the Housing Authority Seeking Revocation of Section 8 Vouchers* – In

13   all, CAT referred 137 families to the Housing Authority for revocation of Section 8 vouchers,

14   nearly 70% of them African Americans. Krisberg Decl. at 16: 3–5. CAT letters to the Housing

15   Authority often contained no information about criminal activity, but instead just focused on

16   Section 8 violations. Larkin Decl., Ex. 13 (Bias Dep. 132:24–133:5); L. Thomas Decl. ¶¶ 7–8.

17       CAT strongly pressed for the revocation of these recipients' benefits. In February 2007,

18   Captain McConnell noted that the most significant obstacle to CAT's success was the slow pace

19   at which the Housing Authority was processing the cases that CAT had "submitted for

20   revocation." Larkin Decl., Ex. 54 (2/18/07 McConnell Memo). In October 2007, after the

21   Housing Authority declined to terminate some of the voucher recipients submitted by CAT,

22   McConnell fumed that the Housing Authority was giving the police department "a black eye."

23   *Id.*, Ex. 55 (10/16/07 McConnell-Hildebrand E-mail). CAT would resubmit cases to the Housing

24   Authority "because they did not take care of business the first time we submitted them. . . ." *Id.*,

25  

---

[8]     The police department has a written consent form that is part of its protocol for conducting a consent search; and officers are trained to use them and carry them in the patrol car. Larkin Decl., Ex. 8 (McConnell Dep. 67:22-68:22). CAT does not use the form. *Id.*, Ex. 11 (Bittner Dep. 282:8-284). CAT officers do not provide evidence of consent in their incident reports either. *Id.*, Ex. 14 (Geis Dep. 173:1-14).

1  Ex. 56 (10/4/07 Schwitters-McConnell E-Mail).

2        CAT carefully monitored each Section 8 referral to the Housing Authority and prepared a

3  monthly report of its activities.  *Id.*, Ex. 47 (C.A.T. Monthly Reports July 2006–June 2008); *Id.*,

4  Ex. 57 (C.A.T. Cases Referred to Housing Authority).  CAT tracked: (1) the number of Section 8

5  vouchers it persuaded the Housing Authority to revoke; and (2) the number of Section 8 families

6  who were forced to move from their homes in Antioch.  *Id.*, Ex. 34 (7/12/07 Schwitters-

7  McConnell E-Mail); *Id.*, Ex. 57 (C.A.T. Cases Referred to Housing Auth.).  When CAT was

8  successful in obtaining terminations of Section 8 vouchers, it circulated the information within

9  the Police Department and publicized it at community forums.  *Id.*, Ex. 58 (10/31/06 Cantando

10  E-Mail).

11        The Housing Authority declined to revoke Section 8 vouchers in more than half of the

12  complaints made by CAT between June 2006 and August 2007.  Larkin Decl., Ex. 59 (12/18/07

13  Resp. to NAACP Req. for Rev. and Inv. of Alleged Section 8 Viol.).  For African-American

14  Section 8 tenants, CAT referrals were even less successful. From 2006–09, the Housing

15  Authority declined to terminate the vast majority of referrals of African Americans (70.2%),

16  suggesting that the referrals for African Americans were based on weaker evidence than those

17  for other Section 8 voucher holders.  Krisberg Decl. at 17: Figure 6.  *See, e.g.*, Joseph Decl. ¶¶ 5,

18  7, 11–12  (CAT sought revocation for "unauthorized resident" although officers knew tenant's

19  brother was a Nevada resident on vacation; revocation proceeding dropped); T. Thomas Decl. ¶¶

20  11–12  (CAT sought revocation for "unauthorized resident" and discontinued garbage service; no

21  revocation); Gray Decl. ¶¶ 30–31 (CAT sought revocation based on unfounded allegations that

22  her minor sons were in trouble with police; no revocation);  L. Thomas Decl. ¶¶ 7–8 (CAT

23  sought revocation based on unauthorized resident; no revocation).

24       *CAT Threatens Section 8 Landlords* – CAT also sent form 'homeowner' letters to

25  landlords, informing them of the results of CAT investigations against tenants and threatening

26  that they would be "held responsible" for their tenants' conduct.  *See*, *e.g.*, Larkin Decl., Ex. 60

27  (7/5/07 APD Landlord Letter); Taylor Decl. ¶ 13 & Exh. A; Gray Decl. ¶ 29 & Exh. A; L.

28  Thomas Decl. ¶ 9 & Ex. B; Larkin Decl., Ex. 11 (Bittner Dep. 308:10–309:1).  CAT boasted that

1   these letters "are working better than anticipated. Directly related to move outs and positive

2   feedback from owners." *Id.*, Ex. 47 (C.A.T. Monthly Reports July 2006–June 2008, at

3   D0014569).  Two thirds of the letters that CAT sent to landlords were for Section 8 tenants, with

4   72% going to those with African-American tenants.  Krisberg Decl. at 14:22–15:6, Fig. 4; Dang

5   Decl. ¶ 7(e).

6         Both renters and landlords objected to these letters from CAT, some highlighting

7   concerns about racial bias.  CAT anticipated and dismissed these concerns.  "Some very negative

8   feed back from renters, especially ones receiving section 8 – they don't like the letters at all!"

9   Larkin Decl., Ex. 47 (July 2006–June 2008 C.A.T. Monthly Reports, at D0014569).  After

10  receiving a letter from CAT, plaintiff Karen Coleman's landlord sent a letter of complaint to

11  Chief Hyde, suggesting that the police harassment of his tenant appeared to be based on "bias."

12  K. Coleman Decl., ¶ 21 & Ex. E. *See also* Ong Decl. ¶¶ 5–9 (landlord Mr. Ong was shocked by

13  false allegations).  CAT also did not settle for simply sending letters – it also telephoned

14  landlords and sometimes made personal visits to their homes.  Larkin Decl., Ex. 13 (Bias Dep.

15  141:11–142:19).  CAT officers repeatedly visited plaintiff Scott's landlord, Riaz Patras, and

16  urged him to evict her.  Patras Decl. ¶¶ 5–9.  They explicitly warned him about renting to

17  African Americans.  *Id.* at ¶¶ 5, 9.

18      *Other Police Officers and Harassment of Section 8 Recipients*  – The Police

19  Department's targeting of African-American Section 8 tenants was not solely carried out by

20  CAT officers.  Larkin Decl., Ex. 45 (12/14/06 Schwitters E-Mail to APD).  Mia White, a former

21  Antioch resident who was not a Section 8 voucher holder, had a conversation with Antioch

22  Police Officer Danielle Sierra, who is not a member of the CAT team:

23         Officer Sierra explained that it was the practice of Antioch police
       officers, on a daily basis, to go to where the African-American

24         Section 8 recipients live in order to wear them down and get them
       out of town.  She said the police officers frequently had to create

25         reports to give to the Housing Authority so that the tenants would
       lose the privilege of receiving Section 8 benefits.  The officer

26         described an established practice of targeting black Section 8
       tenants in order to drive them out of Antioch.

27  M. White Decl. ¶¶ 9–10.

28

Class members will testify that they were targeted or intimidated by the Antioch police officers, in some cases where no referral to the Housing Authority was ever made or a CAT case opened.

- Quinetta Gray was told by Antioch police officers that her house would be "red flagged"; she later learned that this meant they would attempt to have her housing benefit revoked.  Gray Decl. ¶¶ 26–27.

- The Antioch police asked Uzuri Day-Bennett if she was Section 8 and also told her that they were going to put a "red flag" on her house.  Day-Bennett Decl. ¶ 7.

- Onita Tuggles was subject to racial slurs from Antioch police officer Bloxsom in connection with an incident at a local gas station.  She was told to "[g]et the fuck out of here.  Get your black ass out of here, because you are not coming to Antioch with this shit."  Larkin Decl., Ex. 64 (Dearmand Tuggles Dep. 41:6–14).  Soon after, CAT referred her to the Housing Authority for termination of her Section 8 voucher.  *Id.*, Ex. 63 (Tuggles Decl.).

- Since 2006, Nathaniel Kearns, an African-American Section 8 recipient, has been stopped and questioned by the Antioch police eight or nine times.  The police have never found any wrongdoing on his part.  Kearns Decl. ¶¶ 5–11, 14–15.

- Rebecca Lewis was moving into her home in June 2007 when she was confronted by officers who demanded to see identification and proof that she was entitled to occupy the home.  Lewis Decl. ¶ 4.

- After CAT was unsuccessful in obtaining a revocation of Lola Thomas' Section 8 voucher, she repeatedly saw patrol cars outside her home apparently monitoring her.  L. Thomas Decl. ¶ 10–11; *see* also Payne Decl. ¶ 14; Williams Decl. ¶ 16; Alexander Decl. ¶ 7.

- There were no complaints or calls for service to the home of Saieda Evans, but after her 12-year-old daughter was disciplined at school for a fight, the police came to Evans' home and referred her to the Housing Authority for revocation.  Evans Decl. ¶¶ 12–15.

- Che Alexander's family was repeatedly subject to police scrutiny, search and questioning yet when he received racially threatening letters, he did not receive adequate police response or protection.  Alexander Decl. ¶¶ 5–6.
- Rosalind Threets was wrongly accused of perpetrating a hit-and-run, threatened, subject to a home search and humiliated by the police.  Threets Decl. ¶¶ 4–9.
- Antioch police refused to provide protection to Tamula Murphy who was repeatedly subject to harassment from the property manager of her rental home.  Murphy Decl. ¶¶ 6–13.
- Antioch police threatened to arrest the minor sons of Nicole Mays without cause and referred to "how people with Section 8 are."  Mays Decl. ¶¶ 5–6.

<u>Antioch's Failure to Respond to Concerns of Race Bias</u>

Within months of launching CAT, community members raised concerns about biased enforcement against minorities and Section 8 recipients.  Larkin Decl., Ex. 47 (July 2006–June 2008 C.A.T. Monthly Reports); *Id.*, Ex. 8 (McConnell Dep., 156:3–157:6).  In 2007, NAACP members also raised concerns to the City Council about CAT targeting.  *Id.*, Ex. 3 (Jakel Dep. 87:19–88:7); Glasper Decl. ¶¶ 8–10.  Several of the named plaintiffs and other Section 8 recipients expressed their concerns about CAT to the City Council as well.  Larkin Decl., Ex. 66 (9/25/2007 City Council Mtg. Minutes).

On December 18, 2007, Public Advocates and Bay Area Legal Aid released a report which documented the racial disparities in CAT practices and it was presented to the City Council at its meeting the same day.  Larkin Decl., Ex. 61 (Public Advocates/Bay Area Legal Aid Rept.); Dang Decl. ¶ 10(c).  The report was based on months of investigation and research, relying on responses to Public Records Act requests to the city and the Housing Authority.  It concluded that "the practices of CAT disproportionately affect African-American families" and that "the CAT has singled out African-American families within the Section 8 population in an attempt to terminate their housing assistance."  The city took no steps to investigate these charges or verify the accuracy of the statistics.  Larkin Decl., Ex. 3 (Jakel Dep. 79:2–9); *Id.*, Ex. 4 (Freitas Dep. 158:23–161:8); *Id.*, Ex. 15 (Kalinowski Dep. 105:3–107:6).

1

2     <u>Statistical Evidence of Adverse Impact on African-American Section 8 Recipients</u>

3        Plaintiffs' expert, Dr. Krisberg, analyzed the available data regarding conduct of CAT.

4 He concluded that "the Antioch Police Department, through its Community Action Team (CAT),

5 engages in practices that have a disproportionate impact on Section 8 households and African-

6 American Section 8 voucher holders." Krisberg Decl. at 1:7–9.[9]  His findings included the

7 following:

8       *Focus on Section 8:*  Data shows that Section 8 households were the main focus of the

9 CAT team, despite the fact that they constituted only a small portion of the Antioch population.

10 In the first year of CAT operation, 2006, only 4.7% of the households in Antioch were Section 8,

11 yet they were 58% of CAT locations.  Among Antioch's renters, 18.6% were Section 8, yet they

12 were 76.7% of CAT rental targets.  Krisberg Decl. at  8:1–6.  The same pattern holds true for the

13 entire period of 2006–2009:  CAT targeted Section 8 at many times the rate of their presence in

14 the population.  The differences are highly significant statistically.  *Id.* at 9:18–11:4, Fig. 1c.  In

15 addition, Section 8 landlords were much more likely to get warning letters from CAT than non-

16 Section 8 landlords. *Id.* at 14:20–15:6, Fig. 4.

17       *Impact on African Americans*:  Although African Americans represent a small percentage

18 of Antioch residents, they hold more than half of the Section 8 vouchers in the city (55.8%).

19 Accordingly, CAT's targeting of Section 8 locations inevitably means that there will be a

20 disproportionate adverse impact on African Americans.  Krisberg Decl. at 11:13–17, Figure 2a.

21 Yet CAT targeted African Americans to an even greater degree than their presence in the Section

22 8 population: between 2006–2009, 68.2% of the Section 8 CAT locations were African-

23 American households.  *Id.* at 14:1–2.  CAT also referred African Americans to the Housing

24 Authority and sent threatening letters to the landlords of Section 8 households, at statistically

25 _____

26 [9]     CAT only kept complete records regarding locations it ultimately designated as CAT or
"problem" locations.  The only comprehensive data on the race of CAT targets is limited to

27 Section 8 locations.  Dr. Krisberg's analyses are therefore limited to CAT locations. Krisberg
Decl. at 6: 4-8 n.1.

28

1    disproportionate rates. *Id.* at 15:1–4, 16: 3–5.

2            Named Plaintiffs' Claims

3            The experiences of each of the named plaintiffs illustrate the harassing investigatory

4    tactics used to target African-American Section 8 voucher holders.

5            Priscilla Bunton – CAT received two noise complaints about Bunton's teenager playing

6    basketball after 7:00 p.m.  Bunton Decl. ¶¶ 5, 8.  CAT officers visited her home and, without a

7    warrant or her consent, thoroughly searched her home, including drawers and closets.  *Id.* at ¶ 6.

8    Although the police concluded that Bunton was fully cooperative, CAT officers submitted an

9    offense report to the Housing Authority the very next day because they suspected that Bunton

10   had an unauthorized resident.  The Housing Authority initially terminated her voucher, but

11   eventually reinstated it.  *Id.* at ¶ 13.

12           Santeya Williams – Williams made a call for assistance in connection with an incident of

13   domestic violence.  Williams Decl. ¶ 9.  When the regular patrol officers learned that she was on

14   Section 8, they notified CAT.  The following day, CAT officers came to her home in search of a

15   possible unauthorized resident or other violation.  Without her consent, they conducted a search

16   of her home and used the fruits of the search to seek revocation of her Section 8 benefits.  *Id.* at

17   ¶¶ 10–13.  The Housing Authority hearing officer found the allegations unsupported and

18   declined to terminate her Section 8 benefits.  *Id.* at ¶ 15.

19           Mary Scott – On January 16, 2007, CAT officers forcibly entered and conducted an

20   unauthorized search of Scott's home, looking for an allegedly unauthorized resident.  Two days

21   later, CAT submitted a letter to the Housing Authority seeking revocation of her benefits.  Scott

22   Decl. ¶¶ 10, 12.  The Housing Authority had initially terminated her benefits, but later rescinded

23   its decision.  *Id.* at ¶ 15.  CAT also wrote and called her landlord, encouraging him to evict her.

24   Patras Decl. ¶¶ 9–10.

25           Karen Coleman – CAT officers conducted an intrusive and unreasonable search of

26   Coleman's home, hoping to prove that her husband, Thomas, was an unauthorized resident.  K.

27   Coleman Decl ¶¶ 15–19; T. Coleman Decl. ¶¶ 5–7.  They returned on two additional occasions

28   and also went to his place of employment.  K. Coleman Decl. ¶¶ 22–23; T. Coleman Decl. ¶¶ 8–

                                                17

9.  CAT sent a letter to the Housing Authority suggesting she had an unauthorized resident. Larkin Decl., Ex. 62 (6/27/07 Bittner Letter to Z. McNab).  CAT contacted Coleman's landlord, attempting unsuccessfully to obtain her eviction.  K. Coleman Decl. ¶ 21 & Ex. D.  Her landlord complained to police that their harassment of Ms. Coleman was biased.  *Id.* at Ex. E.

Alyce Payne – Plaintiff Payne sought police assistance in connection with incidents of domestic violence.  CAT officers used those opportunities to collect evidence against her to support revocation of her Section 8 voucher, without disclosing to the Housing Authority that the calls for service were for domestic violence.  When it learned the truth, the Housing Authority declined to terminate Payne.  Payne Decl. ¶¶ 6, 10, 11, 13 & Ex. D.

## CLAIMS FOR RELIEF AND REMEDIES SOUGHT

Plaintiffs allege three alternative legal theories on behalf of the class which, if proven, would establish violations of multiple federal and state laws. [10]

Adverse Impact – Plaintiffs allege that the defendant's practice of targeting Section 8 households has an adverse impact on African Americans.  Under this theory, first developed in Title VII cases, statistical evidence that a policy, neutral on its face, has an adverse impact upon a protected class will establish a *prima facie* case.  No proof of discriminatory intent is required to prevail on this claim.  *Pfaff v. HUD*, 88 F.3d 739, 745–6 (9th Cir. 1996). [11]  Adverse racial impact would constitute a violation of the Fair Housing Act (FHA), 42 U.S.C. § 3617, because defendant coerced, intimidated, threatened or interfered with class members' exercise and enjoyment of their rental homes.  *The Comm. Concerning Cmty. Improvement v. City of Modesto*, 2009 WL 3208728, at *18 (9th Cir, October 8, 2009);  *Pfaff*, 88 F.3d 739.  The same adverse impact evidence may be used to prove defendant's liability for race discrimination under the Fair Employment and Housing Act (FEHA). Cal. Gov't Code §§ 12955(d), (g) & (k),

---

[10]    The named plaintiffs also allege, individually, that defendant inflicted emotional distress, either intentionally or negligently, and interfered with their contractual relationships.  First Amended Complaint at ¶¶ 131–41.

[11]    If plaintiffs establish adverse impact, the burden shifts to defendant to rebut the impact by showing that its policy or practice was justified by a legally sufficient, nondiscriminatory reason. *Pfaff*, 88 F. 3d at 746-47.

1   §12955.7, 12955.8(b); *Sisemore v. Master Financial, Inc.*, 151 Cal.App.4th 1386, 1418–23

2   (2007).  Finally, the city's conduct violates Cal. Gov't Code § 11135, which prohibits racial

3   discrimination by recipients of state funding.  That statute's implementing regulations include a

4   proscription against adverse impact, for which parties may state a claim.  Cal. Gov't Code

5   § 11139; 22 Cal. Admin Code 98101(i)(1); *Darensburg v. Metro. Transp. Comm'n*, 611 F. Supp.

6   2d 994, 1041–42 (N.D. Cal. 2009).

7         Source of Income Discrimination – Plaintiffs allege that defendant violated FEHA by

8   discriminating against class members on the basis of their source of income, Section 8 housing

9   assistance.  Cal. Gov't Code § 12955(d),(g) & (k); *see also* Cal. Gov't Code § 12955 (p)(1)

10  (defining "source of income").  To succeed on this claim, plaintiffs need not show that there was

11  *any* racial discrimination, intentional or otherwise, only that defendant's practices had the intent

12  or effect of discriminating based upon the class member's source of income.

13        Intentional Discrimination – Finally, plaintiffs allege that defendant has engaged in a

14  pattern or practice of intentional discrimination against African-American class members and

15  carried out unreasonable and unlawful searches of their homes.  Gross statistical disparities

16  alone, or in conjunction with other circumstantial evidence, may raise an inference of intent.  *The*

17  *Comm. Concerning Comty. Improvement*,  2009 WL 3208728 at *7 (9th Cir. Oct. 8, 2009);

18  *Village of Arlington Heights v. Metro. Hous. Dev. Corp*, 429 U.S. 252, 264–66 (1977).

19        Intentional discrimination violates the Fair Housing Act, the Fair Employment and

20  Housing Act and Government Code § 11135.  Plaintiffs also allege liability under 42 U.S.C.

21  § 1983 for violations of plaintiffs' constitutional rights under the Fourteenth Amendment Equal

22  Protection Clause and the Fourth Amendment.  These practices also violate Article I, §§ 7 & 13

23  of the California Constitution.

24        Remedies – Defendant's conduct is continuing and is likely to recur absent an injunctive

25  order.  In addition to supporting declaratory and injunctive relief, these claims expose defendant

26  to statutory damages.  Plaintiffs seek class damages only under California's Bane Act, Cal Civ.

27  Code § 52.1, which authorizes statutory minimum damages of $4,000 per incident in which

28  defendant interfered, through threats, intimidation, or coercion, with their statutory or

1    constitutional rights.  Cal. Civ. Code §§ 52(a), 52.1(b).

2                               **LEGAL ARGUMENT**

3           This Court must apply a "rigorous analysis" to determine if the evidence satisfies each of

4    the Rule 23 class certification requirements.  *Gen. Tel. Co. of the Southwest v. Falcon*,

5    457 U.S. 147, 161 (1982).  "Although some inquiry into the substance of a case may be

6    necessary to ascertain satisfaction of the commonality and typicality requirements of Rule 23(a),

7    it is improper to advance a decision on the merits to the class certification stage." *Staton v.*

8    *Boeing*, 327 F.3d 938, 954 (9th Cir. 2003); *see Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178

9    (1974); *Californians for Disability Rights, Inc. v. Cal. Dep't of Transp.*, 249 F.R.D. 334, 345

10   (N.D. Cal. 2008).  The district court is nonetheless "at liberty to consider evidence which goes to

11   the requirements of Rule 23 even though the evidence may also relate to the underlying merits of

12   the case." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 509 (9th Cir. 1992).

13          District courts in this and other circuits have frequently certified class actions to

14   challenge allegedly illegal law enforcement.  *See, e.g.*, *Lehr v. City of Sacramento*, 2009 WL

15   2590628 (E.D. Cal. Aug. 21, 2009) (police confiscation and destruction of the property of

16   homeless individuals); *Kincaid v. City of Fresno*, 244 F.R.D. 597 (E.D. Cal. 2007) (same);

17   *Moyle v. County of Contra Costa*, 2007 WL 4287315 (N.D. Cal. Dec. 5, 2007) (juvenile strip

18   search policy); *Arnold v. Arizona Dep't of Public Safety*, 2006 WL 2168637, at *4 (D. Ariz. July

19   31, 2006) (targeting of minority drivers in conducting traffic stops and searches); *Hickey v. City*

20   *of Seattle*, 236 F.R.D. 659 (W.D. Wash. 2006) (mass arrests at WTO demonstrations); *Ledford v.*

21   *City of Highland Park*, 2000 WL 1053967 (N.D. Ill. Jul. 31, 2000) (racial profiling by police).

22   *Cf. Int'l  Molders & Allied Workers' Local Union No. 164 v. Nelson*, 102 F.R.D. 457 (N.D. Cal.

23   1983) (Hispanics targeted for immigration raids).

24          **A.      Proposed Class Definition**

25          Plaintiffs ask the Court to certify a class defined as follows:

26                  all African-Americans who have held, currently hold, may hold, or
                    are erroneously regarded by the City and officers of the Antioch
27                  Police Department as holding, Section 8 housing vouchers, and all
                    members of their households, who reside, have resided or will
28                  reside, in the City Antioch.

                                            20

First Amended Complaint, ¶ 17.

**B.     All Requirements of Rule 23(a) Are Satisfied**

Plaintiffs meet each of the four requirements of Rule 23(a):  numerosity, commonality, typicality and adequacy of representation.  Fed. R. Civ. P. 23 (a).

**1.     The Proposed Class is Sufficiently Numerous**

Rule 23(a)(1) requires that the proposed class be so numerous that "joinder of all members is impracticable."  Fed. R. Civ. P. 23 (a)(1).  There is no need "to state the exact number of potential class members, nor is a specific number of class members required for numerosity." *Californians for Disability Rights v. Cal. Dep't of Transportation,* 249 F.R.D. 334, 347 (N.D. Cal. 2008).  Housing Authority data indicates that for the period of 2006 – 2009, there were 1,061 African-American Section 8 households in Antioch.  (Dang Decl. ¶ 5(b), Krisberg Decl. at 12:13–15).  As a "household" typically includes more than one family member, the class is likely to be significantly larger than that figure.  This number plainly satisfies the numerosity requirement. *Californians for Disability Rights*, 249 F.R.D. at 346.

**2.     The Class Shares Common Questions of Law and Fact**

Rule 23(a)(2) requires that "there are questions of law and fact common to the class." Fed. R. Civ. P. 23(a)(2).  Commonality is a "flexible standard" that should be "construed permissively." *Parra v. Bashas' Inc.*, 536 F.3d 975, 978 (9th Cir. 2008), *cert. denied*, 2009 WL 160657 (Jan. 26, 2009).  "Where the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists." *Id.* at 978–79.

At class certification, the role of the court is to ascertain whether there exist *questions* of law or fact common to the class, not to *answer* those questions.  *See Hnot v. Willis Group Holding*, 241 F.R.D. 204, 210 (S.D.N.Y. 2007).  Plaintiffs have offered extensive evidence that CAT targeted Section 8 families, in general, and African-American Section 8 recipients, in particular, with a significant adverse impact upon African Americans. This targeting reflects a pattern or practice of discrimination.  While defendant denies the existence of this pattern and practice, plaintiffs have shown that common questions plainly exist.

Common questions of fact presented by this case include: (1) whether defendant and its CAT unit target Section 8 recipients; (2) whether the targeting of Section 8 households has an adverse impact upon African Americans;  (3) whether defendant and its CAT unit have engaged in a pattern or practice of intentionally targeting African-American Section 8 recipients; (4) whether defendant and its CAT unit conducted illegal home searches of Section 8 recipients, particularly those who are African-American; (5) whether defendant and its CAT unit make or have made unfounded referrals, including domestic violence incidents, to the Housing Authority for Section 8 voucher recipients, particularly those who are African-American; (6) whether defendant and its CAT unit disproportionately contact Section 8 landlords, particularly those with African-American tenants, and threaten them with liability for the conduct of their tenants; and (7) whether defendant can prove a legitimate, nondiscriminatory reason for its policy and practice of targeting Section 8 and African-American households, and if so, whether there are less discriminatory alternatives available.

Common questions of law include whether defendant's conduct constitutes actionable discrimination under the adverse impact or intentional discrimination theories or violates FEHA's "source of income" provision, whether injunctive relief is warranted, and whether defendant is liable for class statutory damages.

### 3.    The Named Plaintiffs' Claims Are Typical

Like commonality, the typicality standard is "permissive," and requires only that the named representatives' claims be "reasonably coextensive with those of absent class members[,] . . . they need not be substantially identical." *Staton*, 327 F.3d at 957.  It suffices that the class representatives are "part of the class and possess the same interest and suffer the same injury as the class members." *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 156 (1982) (internal quotation marks omitted).  Typicality and commonality tend to merge.  *Id.* at 157 n.13.

Here, the named plaintiffs are all African-American Antioch residents who receive Section 8 vouchers.  Like the class, they have been subject to investigation and targeting by the CAT team since 2006 by means of the techniques set forth in the CAT Flow Chart.  Larkin Decl., Ex. 11 (Bittner Dep. 175:6 – 177:23).  For each of them, CAT attempted to get her Section

22

8 voucher revoked through a referral to the Housing Authority.  CAT officers contacted each of their landlords in writing, using the same form letter, threatening that they would be held liable for the actions of their tenants. *Id.*, Ex. 11 (Bittner Dep. 306:16–307:7).  With the exception of Ms. Payne, the named plaintiffs have each been subject to overbroad or illegal police searches.  Williams Decl. ¶¶ 6–11; Bunton Decl. ¶¶ 5–13; Scott Decl. ¶¶ 8–15; K. Coleman Decl. ¶¶ 15–24.  As such, their claims are typical of those of the class.

### 4. The Named Plaintiffs are Adequate Class Representatives

Rule 23(a)(4) requires that the class representatives "will fairly and adequately protect the interests of the class."  The rule is satisfied where, as here, the representatives' claims are sufficiently interrelated, and not antagonistic, to the claims of the class.  *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1020 (9th Cir. 1998).  There is no antagonism between the named plaintiffs' claims and those of the class they seek to represent, and their interests are the same.  The named plaintiffs each affirm their willingness to undertake the responsibilities of serving as class representatives.  Williams Decl. ¶ 19; Bunton Decl. ¶ 15; Scott Decl. ¶ 22; K. Coleman Decl. ¶ 26; Payne Decl. ¶ 21.

### C. Plaintiffs Meet the Requirements of Rule 23(b)

Federal Rule of Civil Procedure 23 requires that a proposed class must also meet the definition of one of the three Rule 23(b) categories.

### 1. The Court Should Certify the Class Under Rule 23(b)(2)

Rule 23(b)(2) is an appropriate basis for certification when the defendant "has acted or refused to act on grounds that apply generally to the class," thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.  Fed. R. Civ. P. 23(b)(2).  "Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of Rule 23(b)(2) classes.  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997); *Barefield v. Chevron, U.S.A., Inc.*, 1988 WL 188433 at *2 (N.D. Cal. Dec. 6, 1988).  Rule 23(b)(2) certification is appropriate here because plaintiffs challenge defendant's actions with respect to the class as a whole.  They seek declaratory and injunctive relief in order to change the police practices that they allege have resulted in

1   discrimination against themselves and the class.

2          In addition to plaintiffs' claims for injunctive relief, they seek statutory minimum

3   damages under the Bane Act for the class. A claim for statutory damages does not preclude

4   certification under Rule 23(b)(2) if injunctive relief is the predominant form of relief sought.

5   *Arnold v. United Artists Theatre Circuit, Inc.,*158 F.R.D. 439, 450–52 (N.D. Cal. 1994) (civil

6   rights class action certified seeking injunctive relief and statutory damages under (b)(2)).  In

7   determining whether injunctive relief is the predominant relief sought, district courts must

8   examine the "specific facts and circumstances of each case" and the "intent of the plaintiffs in

9   bringing the suit." *Molski v. Gleich,* 318 F.3d 937, 950 (9th Cir. 2003).  Here, plaintiffs seek

10  substantial injunctive relief.  First Amended Complaint ¶ 148.  Moreover, the plaintiffs each

11  attest that their primary goal in bringing the litigation is to change the practices of the Antioch

12  Police Department.  Williams Decl. ¶ 20; Bunton Decl. ¶ 15; Scott Decl. ¶ 21; K. Coleman Decl.

13  ¶ 25; Payne Decl. ¶ 20.  The class does not seek emotional distress damages or other remedies

14  that turn on the subjective feelings of class members, or punitive damages; rather, the only

15  monetary relief sought is statutory damages that may be awarded without individualized proof of

16  damages. *Botosan v. Paul McNalley Realty*, 216 F.3d 827, 835 (9th Cir 2000).[12]

17              **2.      Alternatively, the Court Could Certify the Class under Rule 23(b)(3)**
                          **or Use Hybrid Certification**

18         The case also satisfies the requirements of Rule 23(b)(3), which are that "questions of

19  law or fact common to class members predominate over any questions affecting only individual

20  members," and class resolution must be "superior to other available methods for fairly and

21  efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  Here, plaintiffs have

22  identified numerous common questions and, by requesting only statutory damages for the class,

23  have removed concerns about complex individual damage determinations.  Questions about each

24  class members' prior history will not preclude certification under Rule 23(b)(3) either. *Moyle*,

25

26  ─────────────────
    [12]      The court may, in its discretion, afford class members the opportunity to opt-out of the
27  class.  Federal Rule of Civil Procedure 23(d) gives the court the discretion to make such an order
    to ensure that the due process rights of the class members are preserved.  *Molski v. Gleich,* 318
28  F.3d 937, 951 n.16 (9th Cir. 2003).  Plaintiffs request that the court do so.

─────────────────

1    2007 WL 4287315.  Finally, class resolution is the superior means of resolving the claims

2    because the class members, poor and struggling to raise families, are unlikely to litigate these

3    claims individually.  *See Lehr*, 2009 WL 2590628.

4         As a third option, the Court could certify this case as a Rule 23(b)(2) class for all

5    purposes except for statutory damages, which it could certify under (b)(3), a practice known as

6    the "hybrid" approach.  *Robinson v. Metro-North Commuter RR*, 267 F.3d 147, 167 (2d Cir.

7    2001); *Mathers v. Northshore Mining Co.*, 217 F.R.D. 474, 487 (D. Minn. 2003); *Barefield v.*

8    *Chevron*, 1988 WL 188433 at *4–5 (N.D. Cal. Dec. 6, 1988).

9         **D.      Appointment of Class Counsel**

10        Rule 23(g) governs the standards and framework for the selection of class counsel for a

11   certified class.  The rule articulates four criteria that the district court must consider in evaluating

12   the adequacy of proposed counsel: (1) the work counsel has done in identifying or investigating

13   potential claims in the action; (2) counsel's experience in handling class actions, other complex

14   litigation, and claims of the type asserted in the action; (3) counsel's knowledge of the applicable

15   law; and (4) the resources counsel will commit to representing the class.  Fed. R. Civ. P.

16   23(g)(1)(A)(i).  The Court is also free to consider any other matter and "[n]o single factor should

17   necessarily be determinative in a given case."  Fed. R. Civ. P. 23(g)(1)(A)(ii); *see* Advisory

18   Committee's note.

19        Plaintiffs ask the Court to appoint the Impact Fund and Bingham McCutchen LLP as co-

20   lead class counsel, with the ACLU of Northern California, Public Advocates, Inc., the Lawyers'

21   Committee for Civil Rights of the Bay Area, and Haywood Gilliam of Covington & Burling LLP

22   as class co-counsel to represent the plaintiff class.  Information relevant to the Rule 23(g) criteria

23   is set forth in the declaration of lead counsel, Brad Seligman.

24                          **CONCLUSION**

25        For the foregoing reasons, the Court should certify the requested class.

26

27

28

1    DATED: October 26, 2009                    IMPACT FUND

2

3
                                               By:_____/s/ Jocelyn D. Larkin_____
4                                                              Jocelyn D. Larkin

5                                                  Attorneys for Plaintiffs and the Proposed Class

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Additional Counsel:**

Lawyers' Committee For Civil Rights
of the San Francisco Bay Area
OREN M. SELLSTROM (SBN 161074)
osellstrom@lccr.com
KENDRA FOX-DAVIS (SBN 248757)
131 Steuart Street, Suite 400
San Francisco, CA  94105
Telephone:  415.543.9444
Facsimile:  415.543.0296

Covington & Burling LLP
HAYWOOD S. GILLIAM, JR. (SBN 172732)
hgilliam@cov.com
One Front Street
San Francisco, CA  94111
Telephone:  415.591.6000
Facsimile:  415.591.6091

American Civil Liberties Union
Foundation of Northern California
ALAN  L. SCHLOSSER (SBN 49957)
aschlosser@aclunc.org
ANDRE I. SEGURA (SBN 247681)
39 Drumm Street
San Francisco, CA  94111
Telephone:  415.621.2493
Facsimile:  415.255.8437

Public Advocates, Inc.
RICHARD A. MARCANTONIO (SBN 39619)
Rmarcantonio@publicadvocates.org
SAMUEL TEPPERMAN-GELFANT
(SBN 240944)
131 Steuart Street, Suite 300
San Francisco, CA  94105
Telephone:  415.431.7430
Facsimile:  415.431.1048

Attorneys for Plaintiffs SANTEYA DANYELL
WILLIAMS, MARY RUTH SCOTT, KAREN
LATREECE COLEMAN, PRISCILLA BUNTON,
and ALYCE DENISE PAYNE.