# EXHIBIT 6

Chief James Hyde

1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SANTEYA DANYELL WILLIAMS,      )
MARY RUTH SCOTT; KAREN         )
LATREECE COLEMAN; PRISCILLA    )
BUNTON, and ALYCE DENISE PAYNE, )
on behalf of themselves and all )
others similarly situated,     )
                               )
                    Plaintiffs, )
                               )
          vs.                  )      NO. C08-02301 SBA
                               )
CITY OF ANTIOCH,               )
                               )
                    Defendant. )
_____)

DEPOSITION OF CHIEF JAMES HYDE

VOLUME I

WALNUT CREEK, CALIFORNIA

JUNE 24, 2009

REPORTED BY:

Cynthia Bynum Palmer

CSR NO. 3556

Chief James Hyde

2

1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3

4    SANTEYA DANYELL WILLIAMS,      )
     MARY RUTH SCOTT; KAREN         )
5    LATREECE COLEMAN; PRISCILLA    )
     BUNTON, and ALYCE DENISE       )
6    PAYNE, on behalf of            )
     themselves and all others      )
7    similarly situated,            )
                                    )
8                   Plaintiffs,     )
                                    )
9         vs.                       )    NO. C08-02301 SBA
                                    )
10   CITY OF ANTIOCH,               )
                                    )
11                  Defendant.      )
     _____)
12

13

14

                  Deposition of CHIEF JAMES HYDE
15
                  taken on behalf of the plaintiffs
16
                  at McNamara, Dodge, Ney, Beatty,
17
                  Slattery, Pfalzer, Borges & Brothers,
18
                  LLP, 1211 Newell Avenue, Walnut
19
                  Creek, California, beginning
20
                  at 9:51 a.m. and ending at 5:04 p.m.
21
                  on Wednesday, June 24, 2009, before
22
                  Cynthia Bynum Palmer, CSR No. 3556
23

24

25

Chief James Hyde

3

APPEARANCES:


    FOR THE PLAINTIFFS:

        COVINGTON & BURLING, LLP
        By: Haywood S. Gilliam, Jr., Esq.
        One Front Street
        San Francisco, California 94111

                and

        BINGHAM McCUTCHEN
        By:  Abigail Conzatti Slonecker, Esq.
            Seth Weisburst, Esq.
        Three Embarcadero Center
        San Francisco, California  94111-4067



    FOR THE DEFENDANT:

        McNAMARA, DODGE, NEY, BEATTY, SLATTERY,
        PFALZER, BORGES & BROTHERS, LLP
        By:  James Fitzpatrick, Esq.
            Howard Patrick Sweeney, Esq.
        1211 Newell Avenue
        Walnut Creek, California  94596


    ALSO PRESENT:  Karen Coleman

    VIDEOGRAPHER:  Sean Grant

Chief James Hyde

6

1          THE VIDEOGRAPHER:  Good morning.  Here begins

2     the deposition of Chief James Hyde in the matter of

3     Santeya Danyell Williams, et al. versus City of Antioch.

4          This case is filed in the United States District

5     Court, Northern District of California, and the case

6     number is C08-02301 SBA.

7          Today's date is June 24th, 2009, and the time is

8     9:51 a.m.  This deposition is taking place at McNamara,

9     Dodge, Ney, Beatty, Slattery & Pfalzer located at

10    1211 Newnut Creek, Walnut Creek, California, 94596, and

11    is being taken on behalf of the plaintiffs.

12          The reporter is Cindy Palmer appearing on behalf

13    of U.S. Legal Support.

14          The videographer is Sean Grant, also appearing

15    on behalf of U.S. Legal Support.

16          Counsel, please identify yourselves and state

17    whom you represent.

18          MR. GILLIAM:  Haywood Gilliam, Abby Slonecker,

19    and Seth Weisburst on behalf of the plaintiffs.  Also

20    present is Karen Coleman, named class representative

21    plaintiff.

22          MR. SWEENEY:  Pat Sweeney, McNamara firm,

23    defendant.

24          MR. FITZGERALD:  James Fitzgerald defending the

25    City of Antioch and also for the deponent, Chief Hyde.

Chief James Hyde

7

1          THE VIDEOGRAPHER:  Will the reporter please

2     swear in the witness.

3                    CHIEF JAMES HYDE,

4     having been first duly sworn, was examined and testified

5     as follows:

6          THE VIDEOGRAPHER:  Counsel?

7                    EXAMINATION BY MR. GILLIAM

8     Q          Good morning, Chief Hyde.

9     A          Good morning.

10    Q          Have you been deposed before?

11    A          Yes, I have.

12    Q          How many times?

13    A          Two to three times.

14    Q          So you have a sense of the ground rules, but

15    I'll go over them quickly.  I'm sure you've likely

16    discussed them with your counsel also.

17              You understand that you're under oath today and

18    that the testimony you're giving is the equivalent of

19    what you would give in a court?

20    A          Yes, sir.

21    Q          A few just basic rules.  One thing that's

22    important is to make sure SO that the record is clear we

23    don't talk over each other so we get a clear record for

24    the court reporter.  Is that okay?

25    A          Yes.

Chief James Hyde

32

1    of what truly was the data, umm, what was, umm, you know,

2    innuendo and what was actual fact.

3    Q        At any point did you determine that there was

4    some link between Section 8 households and crime?

5    A        I think there was a -- what I -- I learned was

6    that, umm, when we met with the Housing director, myself,

7    Mr. Jakel, and I believe assistant city manager

8    Arlene Mornick to, you know -- to find out some

9    information, can we work together, is that over a course

10   of several meetings what we learned is that we were given

11   different information which was contrary from information

12   from the first meeting.

13            As an example, we were told that there was a --

14   a screening process of applicants and that screening

15   process was a criminal history screening process.  In

16   later meetings we learned that the screening process was

17   a credit history check and there was no criminal history

18   screening process because the Housing Authority neither

19   had a process or funding to do that, umm  --

20   Q        Okay.  So let me ask a -- the question again,

21   which is did -- was there any study done by you or others

22   in the Department to try to figure out if there was a

23   link between Section 8 households and criminal activity?

24            MR. FITZGERALD:  Objection.  Lacks foundation as

25   to time.

Chief James Hyde

33

1        MR. GILLIAM:  Ever.

2        THE WITNESS:  Umm, in the process of -- of

3    looking at crime data and trying to track it across the

4    City, umm, you know, I think we look at all the different

5    causes and issues, but to be quite honest, we do not have

6    the resources and staff to do -- to conduct that kind of

7    research study around is there a link between crime and

8    Section 8.

9    Q      So you never did because you didn't have the

10   resources?

11   A      Yeah.  We just didn't -- didn't have the

12   resources, umm, and to be quite honest, it wasn't a --

13   necessarily a priority for me.  It was around how do we

14   reduce crime, how do we do more community outreach, how

15   do we work with youth in Antioch.  Umm, Antioch has the

16   highest juvenile population in Contra Costa County, umm,

17   so we -- you know, how do we work with -- with kids

18   growing up.

19       We had a -- a school district from my perception

20   was very overwhelmed and over burdened, umm, campuses

21   with -- as an example, umm, one of the high school's

22   population at campus was 3500 kids, where usually a

23   campus is around 1500, no more than 2,000, so what I saw

24   was a community that in many regards as I talked before

25   that outgrew its infrastructure and was struggling even

Chief James Hyde

42

1    because they were the tenured officers.  As an example,

2    Sergeant Schwitters had done community policing endeavors

3    in Antioch early in his career as a patrol officer, the

4    same with Steve Bias, umm, and with Officer Dillard, his

5    prior experience in other jurisdictions, I think he

6    originally was a police officer in Atlanta for a period

7    of time, so, you know, these were tenured, experienced

8    police officers that were in the unit.

9    Q       So they had generalized training in their past

10   about community policing issues but no training

11   particular to the CAT unit once it was created.  Is that

12   right?

13   A       That's correct.  Umm, although I don't have

14   their training records in front of me to -- to work from.

15           MR. GILLIAM:  Okay.  Let's see.  So let's look

16   at what's been previously marked as Exhibit 3.

17   Q       (By Mr. Gilliam)  I don't know who put the copy

18   of the post-it on there, but --

19   A       Thank you.

20   Q       You're welcome.

21           (Off record between counsel and witness.)

22           THE WITNESS:  Okay.

23   Q       (By Mr. Gilliam)  You've read it?

24   A       Yes, sir.

25   Q       Chief Hyde, do you recognize deposition

Chief James Hyde

43

1    Exhibit 3?

2    A       Yes.

3    Q       And what do you understand it to be?

4    A       As stated at the top of the document, it says,

5    "CAT Case Flow Chart."  It incorporates the primary

6    casing of SARA, scan, analysis, response, and assessment.

7    Q       Did you have any role in drafting this document?

8    A       Umm, not in drafting the document.  My request

9    through Captain McConnell is that, umm, we -- what we do

10   we use a problem solving model.  It would help us

11   identify those community problems that were requiring

12   greater need than others.  It also would document in a

13   problem solving model of things we would do.

14   Q       Okay.  So you asked Captain McConnell to create

15   this document?

16   A       What -- I didn't ask him to create this

17   document.  What I asked him to do was to incorporate the

18   SARA model into the Community Action Team's activities,

19   and out of that discussion was the creation of this flow

20   chart.

21   Q       Okay.  Do you remember when that discussion with

22   Captain McConnell was?

23   A       It was early on in my arrival to Antioch.  It

24   was around the concern from my standpoint of expanding

25   the Community Action Team around businesses, schools, and

Chief James Hyde

47

1    Q        And you told Captain McConnell that?

2    A        Yes.

3    Q        And -- and what was the purpose of this document

4    as you understood it?

5    A        Well, my -- my understanding of the purpose was

6    to incorporate a problem solving model around the

7    Community Action Team's work for the ability to

8    prioritize what work they were gonna work on, umm, and

9    then the other thing too is for that work is to

10   incorporate the -- the SARA problem solving model in

11   that.

12   Q        Let me be clearer.

13            What was the purpose as you understood it for

14   having the document?

15   A        Umm, I think it was just a -- a model for folks

16   to use.

17   Q        In your view does this rise to the level of a --

18   a policy of the Antioch Police department?

19   A        Not a policy, no.

20   Q        Why not?

21   A        Umm, it doesn't -- it doesn't fit the

22   traditional model of a policy statement.  Umm, at best

23   it's -- it's a flow chart -- chart of work, a procedural

24   flow chart.

25   Q        Is it suggested guidelines for working CAT

**Chief James Hyde**

48

1    matters?

2    A       Yes.

3    Q       Let's look at the second page that's headed

4    "Intake/Scanning."  Looking at the fourth bullet point

5    there, it says, "Determine if there are legitimate,

6    ongoing issues that needed addressing.  If so, create a

7    CAT event."

8            What criteria were used to decide whether a CAT

9    event was appropriate to create?

10   A       My understanding from the -- the CAT officer's

11   standpoint is, umm, the number of calls for service, umm,

12   and -- and what was the type of call for service.  It

13   could be one call for service, such as drug dealing in

14   which an arrest was made at the -- the location, so one

15   event could rise to the level of being considered a -- a

16   problem location, or multiple events over time.

17   Q       Okay.  So it was entirely within the discretion

18   of the individual officer?

19   A       Umm, yes.

20   Q       Are you aware of any training that occurred

21   regarding making that decision as to whether a CAT event

22   was or wasn't appropriate?

23   A       Umm, I'm not aware of -- of that -- that

24   training.

25   Q       Was it your understanding that suspicion that an

Chief James Hyde

56

1    criminal in nature.  Could be an argument among parties

2    that just got loud but not physical.

3    Q        It's your understanding that CAT usually

4    responds to crimes in progress?

5    A        Umm, no.  They usually respond to after an

6    incident has happened.

7    Q        And can non-criminal activity be the basis for

8    the creation of a CAT event?

9    A        Again, it would -- would it -- typically, no

10   probably would be the best answer.  Again, it's a

11   case-by-case decision based upon the information and the

12   facts that the Community Action Team officers have at the

13   time; they determine that.

14   Q        And so in that regard too, is the decision

15   whether to create a CAT event based on non-criminal

16   conduct left solely to the discretion of the officer?

17   A        The decision to decide whether a problem

18   location becomes a -- rises to a level to become a -- a

19   CAT event is based upon on a case-by-case decision by the

20   toe Community Action Team officers.  That's probably --

21   the -- the best example I can give you.  It's case by

22   case.

23   Q        Uh-huh.  Looking at -- if we go back to Exhibit

24   3, which is the flow chart  --

25   A        Uh-huh.

Chief James Hyde

57

1    Q        -- under is that same bullet we were looking at,

2    bullet four, umm, the next statement there, there's a

3    list that says, "Give the problem house one of four

4    ownership titles, owner occupied, rental, HUD, or other."

5            Is it common practice for the CAT team to

6    document whether a problem location is receiving

7    Section 8 assistance.

8    A        I think what the officers are trying to do is

9    identify who has standing with the property, whether it's

10   owner occupied, it's a straight landlord-tenant

11   relationship, or it's a landlord-tenant and the

12   Housing Authority relationship, or it's a business or

13   generally it would be like a park, umm, or a street

14   corner in which narcotic activity is occurring at.

15   Q        Okay.  And you -- you explained the purpose for

16   this, and I appreciate that.  The question was is it

17   CAT's practice to document whether identified problem

18   locations are receiving Section 8 assistance?

19   A        Again, if -- I think what you're trying to

20   determine is in that process they may determine that it

21   is a -- a Section 8 subsidized house, but they're trying

22   to determine who has property standing in -- in this

23   model.

24   Q        Okay.  So was the answer to my question "yes"?

25   A        I would say it was documented that way.  Yes.

Chief James Hyde

103

1    Q      -- violent crime.

2           Those were all crimes.  Right?

3    A      Yes.

4    Q      Because those are all subsets of criminal

5   behavior?

6    A      Yes.

7    Q      All right.  In your view could the problem house

8   designation be based on either criminal or non-criminal

9   conduct?

10   A      What I find, it tends to be both.

11   Q      Could it be just non-criminal conduct that could

12   lead to a property being a problem house?

13   A      If it's a violation of HUD guidelines, that

14   could be, umm, more of a -- a procedural policy program,

15   umm, violation under HUD.

16   Q      And so part of what the APD was taking into

17   account in deciding what were problem houses was whether

18   the houses were in compliance with HUD Section 8

19   guidelines?

20   A      I guess what I'm -- probably the -- the -- the

21   clear answer to -- to answer your question would be it's

22   a case-by-case basis and incorporates both criminal

23   behavior and can include non-criminal behavior.  Umm, to

24   try to find a solution to the problem.

25   Q      So the problem house definition is just

Chief James Hyde

104

1    case-by-case?

2    A        I would say the interpretation of -- of what is

3    a problem house is case-by-case, yes.

4    Q        Okay.  Do you disagree with Captain McConnell's

5    formulation here?

6    A        No, I don't.

7    Q        Okay.  Umm, now, there's some -- then if you

8    look at the third paragraph down, it says, "The

9    Community Action Team began working with personnel from

10   the local CHA office and quickly realized the CHA office

11   was under-staffed, inexperienced, and mired in

12   bureaucracy."

13           Did you agree with that assessment at the time

14   by Captain McConnell?

15   A        Yeah.  That was actually a similar wording to

16   what Rudy Tamayo had related to us that -- when we had

17   asked could you please handle these complaints" from the

18   community around -- if it ended up being a subsidized

19   home under your umm, preview that, you know, could you

20   please handle these complaints, and it would be a lot

21   easier for the Police department just to refer these

22   issues to the Housing Authority and not have to address a

23   lot of the issues with these properties.

24           And his comments back were, "We're

25   under-staffed, we have limited training, and we have a

Chief James Hyde

141

1  fine with that.

2  Q        Okay.  Did you -- were any of the folks in the

3  CAT unit, did you ever hear them suggest that they really

4  wanted the list?

5  A        You know, I think initially, umm -- as far as

6  their discussions, I don't -- I don't recall their

7  discussions.

8          I know my discussions with Mr. Tamayo were that,

9  umm, if we provided 'em with the addresses of every house

10  an officer went to in Antioch and then, you know, he

11  could tell us if they were Section 8, we're like well,

12  isn't it easier to just give us the list and then we can

13  tell you which ones are important?  So we discussed that

14  issue.  It never -- it never occurred.

15  Q        So your recollection is that Mr. Tamayo was

16  volunteering to share information with you about which

17  households were on Section 8?

18  A        Yes, and in that process we're trying to find

19  some type of, you know, agreement in doing that.

20          MR. GILLIAM:  Okay.  Let's -- let's mark Exhibit

21  123.

22          MR. FITZGERALD:  It's about time to take a break

23  I think.

24          MR. GILLIAM:  Yeah.  This is the last one on

25  this topic, so why don't we go one more and then  --

Chief James Hyde

162

1    Q        Did you -- do you recall whether you asked him

2    to do more investigation about the Section 8 home that's

3    described here?

4    A        Well, my concern -- I don't know if I asked him

5    to do additional investigation.  My concern was if this

6    person was at a prior residence that generated a number

7    of calls for service and moved from that residence to

8    another one, what was happening in the Housing Authority

9    process, umm, for review, No. 1.

10           Umm, No. 2, the issues of the person being on,

11   umm, -- had a prior felony convictions for drug sales and

12   fraud, umm, and being on felony probation for fraud

13   conviction.  I was rather startled by, umm, the picture

14   of the home in which the person moved into again from

15   a -- a program management perspective of, umm, you could

16   help two families with the -- the rent you would be

17   paying for one expensive home.  You could use that money

18   to help two families, so the frustration over the, umm,

19   the program management and the tenant screening.

20   Q        And that's something you felt frustration about?

21   A        Yes.

22   Q        And a number of people in the community felt

23   frustration about that too, did they not?

24   A        Yes.

25   Q        The fact that Section 8 recipients were living

Chief James Hyde

163

1    in very nice, very expensive homes?

2    A         From the community.  Several community members

3    had related that it defied logic that, umm, someone who

4    was receiving a federal subsidy could live in a home,

5    umm, worth a million dollars on -- on the real estate

6    market at the time.

7    Q         And were citizens -- citizens in the community

8    were calling on the Police department for action about

9    that, weren't they?

10   A         I think what citizens were calling for was, one,

11   that the Housing Authority would better manage the

12   program and, two, that the Police department would work

13   on crime issues reference problem properties and that the

14   expectation is that the Police department and the

15   Housing Authority would work together if they need to.

16   Q         And understanding that though you would agree

17   that the sort of program management types of things that

18   you're talking about, umm, how much the voucher is, what

19   type of house the Section 8 recipient can live in, that's

20   not a law enforcement concern, is it?

21   A         A law enforcement concern?  No, but it defies

22   logic that the -- even in the -- in the HUD audits, the

23   federal HUD audits it pointed out that basing the value

24   of San Francisco rental properties and applying it to

25   Contra Costa County, umm, was not an appropriate use of

**Chief James Hyde**

164

1     funds.  I think that was one of their concerns.

2     Q     Okay.  And you shared that view.

3     A     I -- I did, yeah.  You could help two families

4     out instead of one by being wiser in how you -- where you

5     allocate your -- your program dollars.

6     Q     This -- then the email -- you forward

7     Captain McConnell's email to Jim Jakel and

8     Arlene Hildebrand and also Captain Cantando.  "Jim, FYI,

9     another Section 8 story."

10          Had -- had you talked with Mr. Jakel about the

11     idea of gathering stories about Section 8 properties?

12     A     Umm, Mr. Jakel wanted me to in a Quality of Life

13     Forum share information about the status of work between

14     the Police department, Housing Authority around problem

15     properties.  Some of those problem properties were

16     Section 8 properties.

17     Q     Okay.  But was there a request for information

18     about Section 8 properties in particular?

19     A     It was reference Community Action Team work

20     and -- which included Section 8 properties.

21     Q     And so he asked you for information about

22     Community Action Team work and you sent him back another

23     Section 8 story?

24     A     I -- I sent him this particular story on Nasswin

25     (phon.).  Yes.

Chief James Hyde

179

1    A        It's a mapping model.

2    Q        Okay.  I see.  And so is it the case that

3    Ms. Johnson would type in addresses for the -- the --

4    type in the addresses of the places that had CAT files

5    open on them and it would generate a map like this?

6    A        That's my understanding.  Yes.

7    Q        And in order to generate a map like this, there

8    would need to be something in the system in the data that

9    says whether a property is a Section 8 house as opposed

10   to an owner owned or a rental house?

11   A        And that would have been determined by the

12   Community Action Team officers' work on particular

13   properties.

14   Q        And the fact that they then put that information

15   into some kind of system at the Department.  Right?

16   A        Umm, to create this map.  Yes.

17   Q        Okay.  Well, was -- did they -- did they put it

18   into the system to create the map, or was it already in

19   the Department's records?

20   A        I don't know.

21   Q        Okay.

22   A        It had to be in some type of record to be then

23   transferred -- the data transferred over to the -- the

24   mapping model.

25   Q        Right.  And so the -- the bulk of the Section 8

Chief James Hyde

180

1    homes on this map are in the southeastern part of

2    Antioch.  Is it your understanding that southeast Antioch

3    is the wealthier part of town?

4    A       It's -- it's newer housing developments, higher

5    property values.

6    Q       And the bulk of the Section 8 residential cases

7    were in that part of town.  Correct?  Southeast Antioch?

8    A       Correct, which was surprising in that, umm, from

9    the -- a program management approach around Section 8

10   properties is that -- my belief is that you would see

11   more of the properties spread across the City, umm, and

12   on the, umm, north side of Highway 4 you have older

13   residential inventory with lower rental prices, so you

14   would think that in managing the money of the

15   Housing Authority you would think that by placing more

16   families into homes you would look for, umm, more

17   affordable rent rates so you could spread your dollars

18   across a -- farther to help more families.  The

19   surprising part -- seemed to be a larger number of homes

20   in the more expensive rental property market.

21   Q       Is it your understanding that the

22   Housing Authority can dictate to Section 8 recipients

23   where they live?

24   A       I have no understanding how they manage that

25   part of their program.

State of California   )

County of Sacramento )


        I, CYNTHIA BYNUM PALMER, CSR, hereby certify

that the witness in the foregoing deposition was by me

duly sworn to testify to the truth, the whole truth, and

nothing but the truth in the within-entitled cause; that

said deposition was taken at the time and place herein

named; that the deposition is a true record of the

witness's testimony as reported to the best of my ability

by me, a duly Certified Shorthand Reporter and

disinterested person, and was thereafter transcribed

under my direction into typewriting by computer; that the

witness was given an opportunity to read, correct, and

sign the deposition.

        I further certify that I am not interested in

the outcome of said action nor connected with nor related

to any of the parties in said action nor to their

respective counsel.

        IN WITNESS WHEREOF, I have hereunder subscribed

my hand this __10th__ day of __July__ , 2009.


                        _Cynthia Bynum Palmer_ CSR

                        CYNTHIA BYNUM PALMER, CSR 3556

208

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SANTEYA DANYELL WILLIAMS;      )
MARY RUTH SCOTT; KAREN         )
LATREECE COLEMAN; PRISCILLA    )
BUNTON, and ALYCE DENISE PAYNE, )
on behalf of themselves and all )
others similarly situated,     )
                               )
                Plaintiff,  )
                               )
        vs.                    )      NO. C08-02301-SBA
                               )
CITY OF ANTIOCH,               )
                               )
                Defendants.  )
_____)

DEPOSITION OF CHIEF JAMES HYDE

VOLUME II

WALNUT CREEK, CALIFORNIA

JULY 24, 2009

REPORTED BY:

Cynthia Bynum Palmer

CSR NO. 3556

Chief James Hyde

209

1                    UNITED STATES DISTRICT COURT

2                    NORTHERN DISTRICT OF CALIFORNIA

3

4    SANTEYA DANYELL WILLIAMS;      )
     MARY RUTH SCOTT; KAREN         )
5    LATREECE COLEMAN; PRISCILLA    )
     BUNTON and ALYCE DENISE PAYNE;)
6    on behalf of themselves and    )
     all others similarly situated,)
7                                    )
                     Plaintiffs,     )
8                                    )
          vs.                        )    NO. C08-02301-SBA
9                                    )
     CITY OF ANTIOCH,                )
10                                   )
                     Defendants.     )
11   _____  )

12

13

14                    Deposition of Chief James Hyde

15                    Volume II, taken on behalf of the

16                    plaintiffs at McNamara, Dodge, Ney,

17                    Beatty, Slattery, Pfalzer, Borges

18                    & Brothers, LLP, 1211 Newell Avenue,

19                    Walnut Creek, California, beginning

20                    at 9:52 a.m. and ending at 12:44 p.m.

21                    on Friday, July 24, 2009, before

22                    Cynthia Bynum Palmer, CSR No. 3556

23

24

25

Chief James Hyde

210

APPEARANCES:


        FOR THE PLAINTIFFS:

                COVINGTON & BURLING, LLP
                By: Haywood S. Gilliam, Esq.
                One Front Street
                San Francisco, California  94111
                        and
                BINGHAM McCUTCHEN
                By:  Abigail Conzatti Stonecker
                Three Embarcadero Center
                San Francisco, California  94111


        FOR THE DEFENDANT AND DEPONENT:

                McNAMARA, DODGE, NEY, BEATTY, SLATTERY,
                PFALZER, BORGES & BROTHERS, LLP
                By:  James V. Fitzgerald, III, Esq.
                1211 Newell Avenue
                Walnut Creek, California  94596

Chief James Hyde

212

```
1                    --o0o--

2           THE VIDEOGRAPHER:  Good morning.  Here begins

3      Volume II of the deposition of Chief James Hyde in the

4      matter of Santeya Danyell Williams, et al. versus the

5      City of Antioch.  This case is filed in the United States

6      District Court, Northern District of California, and the

7      case number is C08-02301-SBA.

8           Today's date is July 24th, 2009, and the time is

9      9:52 a.m.  This deposition is taking place at McNamara,

10     Dodge, Ney, Beatty, Slattery & Phalzer, located at

11     1211 Newell Avenue, Walnut Creek, California, 94596, and

12     is being taken on behalf of the plaintiffs.

13          The reporter is Cindy Palmer, appearing on

14     behalf of U.S. Legal Support.  The videographer is

15     Sean Grant, also appearing on behalf of U.S. Legal

16     Support.

17          Counsel, please identify yourselves and state

18     whom you represent.

19          MR. GILLIAM:  Haywood Gilliam and Abby Slonecker

20     on behalf of the plaintiffs.

21          MR. FITZGERALD:  James Fitzgerald on behalf of

22     defendant City of Antioch, and the deponent, Chief Hyde.

23          THE VIDEOGRAPHER:  Would the reporter please

24     swear in the witness.

25
```

**Chief James Hyde**

213

```
1                        CHIEF JAMES HYDE,

2    having been first duly resworn, was examined and

3    testified as follows:

4              THE VIDEOGRAPHER:  Counsel?

5                 EXAMINATION BY MR. GILLIAM

6    Q        Good morning again, Chief.

7    A        Good morning.

8    Q        And just one housekeeping matter.  By our count

9    we've got about two hours and 15 minutes remaining of our

10   seven hours, and I suspect we'll use all of that time,

11   but we'll keep track of that.

12             One thing I think we -- I may do is for

13   efficiency when there are longer documents for you to

14   review we may go off the record, let you review, and come

15   back on and ask the questions to -- to move things along.

16             The same rules apply here today that did in your

17   last deposition.  Do you have those in mind?

18   A        Yes, I do.

19   Q        Is there any reason that you wouldn't be able to

20   recall and testify truthfully here today?

21   A        To the best of my knowledge, no.

22   Q        No medications, anything like that?

23   A        No.

24   Q        Okay.  Have you reviewed any transcripts of

25   other depositions since we were here last?
```

Chief James Hyde

271

1    answer the question.

2    Q        (By Mr. Gilliam)   If you know.

3    A        Umm, what I do know is that a number of

4    community members of African American descent had felt

5    that Bay Area Legal Aid had not approached them as

6    community leaders to seek their input before, umm, they

7    made contrary comments concerning the city of Antioch.

8    Q        Okay.  So, again, my question -- he seems to be

9    saying he knows that the people who are at issue here are

10   people who are violating the Section 8 rules.  My

11   question is, one, did you ever have a discussion with him

12   about that?

13   A        No.

14   Q        Okay.  Do you know if anyone else in the

15   Antioch Police Department had a discussion with him about

16   that?

17   A        I do not.  I know we had conversations with the

18   Contra Costa Housing Authority in reference community

19   concerns around their management of the program and

20   responsiveness to community complaints.

21   Q        So, as far as you know, no one from the

22   Antioch Police Department provided particular information

23   about specific Section 8 voucher recipients to

24   Mr. Gilbert?

25   A        Umm, they may have shared information with him

Chief James Hyde

272

1   when he forwarded citizens' complaints, community member

2   complaints through his organizations to the Department.

3   Q       Okay.  When you say "may have," would you know

4   if that were the case?

5   A       Umm, I do know that the Community Action Team

6   officers were working with community members on trying to

7   address problems, and my assumption is that people were

8   sharing information to help solve problems.

9   Q       To include sharing with Mr. Gilbert details

10  about particular Section 8 recipients who were

11  African American?

12  A       I don't know what information was shared between

13  the community team -- the Community Action Team officers

14  and Mr. Gilbert, just that Mr. Gilbert had become a way

15  to forward community complaints, neighborhood complaints

16  through his organization, United Citizens for Better

17  Neighborhoods, to the City of Antioch.

18  Q       Okay.  But so that -- I just need to be clear.

19          To your knowledge did CAT officers share

20  information about particular Section 8 recipients with

21  UCBN?

22  A       I'm sure that CAT team officers shared

23  information about problem locations.  Were they specific

24  about Section 8 or African American residents?  I

25  couldn't answer that question right now.  I don't have

Chief James Hyde

273

1    that information in front of me and don't know if it

2    exists.

3    Q       Okay.  And that's a fair point.

4            Did anyone within the Antioch Police Department

5    tell you that they had shared information about

6    particular African American Section 8 recipients with

7    UCBN?

8    A       Not that I recall.  I do know people were

9    working on trying to solve problems at the community

10   level between the Community Action Team officers, the

11   Housing Authority, and neighborhoods.

12   Q       When did you first hear about the allegations of

13   racial bias against CAT?

14   A       Fairly early on.

15   Q       When?

16   A       Umm, when the Community Action Team officers

17   would go and contact, umm, tenants who were involved in

18   criminal activity or investigating complaints from

19   neighborhoods, community members.

20   Q       I -- I didn't follow that.

21           In other words, when -- when did you first find

22   out that someone, anyone was alleging racial bias against

23   the CAT members?

24   A       Umm, pretty much from the beginning.  I've been

25   in law enforcement now for almost 30 years, and during

State of California  )

County of Sacramento )


      I, CYNTHIA BYNUM PALMER, CSR, hereby certify that the witness in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place herein named; that the deposition is a true record of the witness's testimony as reported to the best of my ability by me, a duly Certified Shorthand Reporter and disinterested person, and was thereafter transcribed under my direction into typewriting by computer; that the witness was given an opportunity to read, correct, and sign the deposition.

      I further certify that I am not interested in the outcome of said action nor connected with nor related to any of the parties in said action nor to their respective counsel.

      IN WITNESS WHEREOF, I have hereunder subscribed my hand this ____ *8th* ____ day of ____ *August* ____ , 2009.

*Cynthia Bynum Palmer CSR*

CYNTHIA BYNUM PALMER, CSR 3556