UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WILLIAMS, et al., | Case No:  C 08-02301  SBA |
| Plaintiffs, | |
| vs. | **ORDER GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| CITY OF ANTIOCH, | |
| Defendant. | [Docket No. 90] |

The parties are presently before the Court on Plaintiffs' Motion for Class Certification. (Docket No. 90.)  Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby GRANTS the motion, with a modified definition of the class, for the reasons set forth below. The Court, in its discretion, finds this matter suitable for resolution without oral argument.  See Fed.R.Civ.P. 78(b).

I.      **BACKGROUND**

      A.      **PROCEDURAL BACKGROUND**

Plaintiffs bring this action against Defendant the City of Antioch ("City" or "Defendant") on behalf of a class of all African-Americans who have held, currently hold, may hold, or are erroneously regarded by the City and officers of the Antioch Police Department as holding, Section 8 housing vouchers, and all members of their households, who reside, have resided or will reside, in the City Antioch.  (First Amended Complaint ("FAC"), ¶ 17.) Plaintiffs allege that the City intentionally discriminates against African-American Section 8 households on the basis of race and/or source of income, and has pursued policies and practices that have an unjustified adverse impact on them.  (Id., ¶ 4.)

In this action, Plaintiffs bring claims against the City under the Fair Housing Act (42 U.S.C. §§ 3601, et seq.), 42 U.S.C. § 1983, and related state laws, and also bring common law

tort claims.  Plaintiffs seek injunctive and declaratory relief, statutory minimum damages for the class, and additional damages for the named Plaintiffs.  (Id., ¶¶ 4, 148.)

Plaintiffs have now filed a motion for class certification, pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2).  (Docket No. 90.)  Specifically, they seek to certify a class defined as:

> all African-Americans who have held, currently hold, may hold, or are erroneously regarded by the City and officers of the Antioch Police Department as holding, Section 8 housing vouchers, and all members of their households, who reside, have resided or will reside, in the City Antioch.

(FAC, ¶ 17; Plfs.' Motion at 20.)  In addition, Plaintiffs seek to have their counsel appointed as counsel for the class.

### B.   PLAINTIFFS' FACTUAL ALLEGATIONS

#### 1.   Section 8 Housing Choice Voucher Program

The Section 8 Housing Choice Voucher Program ("Voucher Program") is a federally-funded housing program whose purpose includes "aiding lower-income families in obtaining a decent place to live and … promoting economically missed housing." (FAC, ¶ 24) (citing 42 U.S.C. § 1437f(a)).  The Housing Authority of the County of Contra Costa ("HACCC") administers approximately 9,100 Housing Choice Vouchers, including about 1,582 Section 8 households in the City of Antioch.  (FAC, ¶ 25.)

HACCC issues vouchers to eligible applicants and enters into contracts with landlords. (FAC, ¶ 27) (citing 42 U.S.C. § 1437f(o)(2)-(4)).  In its contract with the landlord, HACCC agrees to make timely monthly rental payments to the owner on behalf of the family.  (FAC, ¶ 27) (citing Section 8 Admin Plan, Ch. 13, Part II.C.  The Voucher Program emphasizes the objective of "housing choice," in terms of allowing low-income participants to relocate to higher opportunity neighborhoods.  (FAC, ¶ 28.)

The Voucher Program requires a participant who has been awarded a housing voucher to find a private landlord who is willing to accept the participant as a tenant.  (FAC, ¶ 29) (citing 42 U.S.C. § 1437f(o)(6)).  Under the program, the housing costs of a low-income Section 8 participant are subsidized such that the participant pays the landlord 30% of his or

her income as rent, with the difference between the participant's payment and the market rent covered by the federal subsidy.  (Id.) (citing 42 U.S.C. § 1437f(o)(2)).   As a condition of receiving benefits, Voucher Program participants agree to abide by a list of "tenant obligations" which include:  not engaging in criminal activity which threatens the health, safety, or right to peaceful enjoyment of neighbors, and not allowing a person not named on the lease to reside on the premises without the permission of the public housing authority.  (FAC, ¶ 30) (citing 42 U.S.C. § 1437f(o)(7)(D); 24 C.F.R. § 982.551(h), (1)). However, disturbances resulting from domestic violence are specifically excluded from being a permissible reason for terminating a participant's benefits or evicting the tenant.  (FAC, ¶ 31) (citing 42 U.S.C. § 1437f(o)(7)(C), (o)(20)(A)).

### 2.   Plaintiffs' Allegations Regarding the City of Antioch and the Community Action Team

In 2003, the number of households that received Section 8 Housing Choice Vouchers from HACCC and chose to live in the City of Antioch ("City") was 1,049.  (FAC, ¶ 32.)  By 2007, this number had grown to 1,582, approximately 4.37% of the total number of the City's households.  (Id.)  Because of the downturn in the City's housing market starting in 2006, Section 8 Voucher participants were able to use their benefits to rent larger homes in more affluent neighborhoods of the City that would otherwise have been left vacant and/or lost to foreclosure.  (Id.)  By February 2006, City officials were publicly attributing problems in the City to an influx of Section 8 households.  (FAC, ¶ 33.)

Beginning in May 2006, the Antioch Police Department ("APD") attempted to obtain a list of all Section 8 properties in the City in order to determine "whether Section 8 households are responsible for a disproportionate number of police calls."  (FAC, ¶ 35.)  The APD reported that the addresses of so-called "repeat offenders" on Section 8 – those whose residences have been the focus of multiple service calls – would be given to HACCC to provide "a basis for revoking eligibility" for Section 8 assistance.  (Id.)

In May 2006, some City residents "complained [to the City Council] … that low-income residents receiving federal housing assistance [were] dragging the city down by

increasing crime and blight."  (FAC, ¶ 36.)  Public officials and residents accused HACCC of neglecting its duty to monitor Section 8 landlord and tenants.  (Id.)  Around that same time, signs appeared on the doors of a number of renters in the City, not placed there by the renter or landlord, stating "No More Rentals.  No More Section 8.  Save Antioch NOW.  WE THE RESIDENTS are watching YOU."  (FAC, ¶ 36.)

In July 2006, the City and the APD created a unit called the Community Action Team ("CAT") within the police department.  (FAC, ¶ 37.)  Although aimed at addressing "quality of life" issues in the City, it has been CAT's practice to disproportionately focus on Section 8 participants, and particularly of those residents in the more affluent neighborhoods of the City. (Id., ¶ 37.)  While the conduct of APD and CAT are focused on Section 8 households, the City and APD have specifically targeted African-Americans they believe hold Section 8 vouchers, to force African-American Section 8 households to move out of the City.  (Id., ¶ 39.)  This perception is supported by repeated statements by city officials, often contrasting Antioch with the City of Richmond, which has a substantial African-American population.  (Id.)

### 3.    Plaintiffs' Allegations Regarding the City's Custom, Policies and Practices

Plaintiffs allege that in establishing CAT to investigate complaints of disturbances and nuisance in residential units, the City intended and knew that a primary focus of CAT would be Section 8 households.  (Id., ¶ 45.)  The City further intended and knew that one of CAT's principal activities would be gathering evidence that Section 8 participants were violating their obligations under Section 8.  (Id.)  While rental housing represents only 25% of City households, 85% of CAT investigations involve rental housing.  (Id.)  Moreover, although voucher participants make up only 5% of City households (one-fifth of all rental housing), two-thirds of CAT investigations involve Section 8 households.  (Id.)

The brunt of CAT investigations fall disproportionately on African-Americans.  (FAC, ¶ 46.)  African-Americans constitute about 14% of City households, yet they are subject to approximately two-thirds of all CAT investigations.  (Id.)  Additionally, while African-Americans constitute 56% of City Section 8 households, 70% of all CAT referrals to HACCC

1   involve African-Americans.  (Id.)

2        When responding to a disturbance or nuisance complaint, APD and CAT have made

3   special efforts to determine if a household member involved in the incident is a Section 8

4   participant.  (FAC, ¶ 47.)  If so, APD and CAT forward the complaint to HACCC, often with

5   the suggestion that the participant be terminated from the Voucher Program.  (Id.)   Data from

6   2007 show that HACCC declined to terminate more than 60% of the time that CAT referred a

7   Section 8 household for termination.  (Id.)  The rate of "unfounded referrals" by CAT to

8   HACCC in 2006 and 2007 was significantly higher for Voucher Program participants

9   identified as African-American.  (Id.)  According to HACCC data, 71.8% of unfounded

10   referrals by CAT involved African-American participants, and only 17.9% involved White

11   participants.

12        Moreover, Plaintiffs allege that the City has discriminated against, harassed, and

13   coerced African-American Section 8 households and African-Americans whom the City

14   erroneously believes to be part of Section 8 households.  Plaintiffs base that allegation on the

15   following alleged policies, patterns, and practices of the City: (1) asking African-Americans

16   under investigation whether they own or rent their home and whether they are Section 8

17   participants; (2) seeking to search and searching the homes rented by African-American

18   Section 8 participants or those erroneously believed to be Section 8 participants; (3) relying on

19   the alleged parolee or probationer status of a person having a relationship to the Section 8

20   participant to establish a basis to search the Section 8 household; African-American Section 8

21   households are disproportionately subject to this conduct; (4) informing neighbors of African-

22   American Section 8 households that the household is receiving Section 8 housing assistance

23   and soliciting and encouraging nuisance, disturbance, and other criminal activity calls about the

24   Section 8 household; (5) compiling records of disturbance calls to African-American Section 8

25   households, and forwarding these compilations to HACCC as evidence of activity that violates

26   the voucher holder's obligations under Section 8; and (6) sending letters or otherwise

27   communicating to landlords of Section 8 tenants stating that the tenant had engaged in

28   criminal/nuisance activity, and advising the landlord that he or she could be held criminally and

civilly responsible; these communications were disproportionately targeted to landlords of African-American Section 8 participants.  (FAC, ¶¶ 49-56.)

Generally, Plaintiffs assert that the aforementioned conduct has a disproportionate adverse impact on African-Americans in the City, and is not justified by necessity.  (FAC, ¶ 56.)

### 4.     The Allegations of the Five Named Plaintiffs

There are five named Plaintiffs in this matter:  Priscilla Bunton, Santeya Williams, Mary Scott, Karen Coleman, and Alyce Payne.  All are African-American residents (or former residents) of the City of Antioch, and all receive Section 8 benefits.  The specific allegations of each named Plaintiff are discussed herein.

Priscilla Bunton.  On September 25, 2006, CAT officers approached Bunton's residence to discuss noise complaints made by her neighbors.  (FAC, ¶ 84.)  They encountered Bunton's boyfriend in the driveway of her home, and discovered that there was a warrant out for his arrest.  (Id.)  The officers arrested Bunton's boyfriend and asked Bunton to consent to a search of her home to locate her boyfriend's identification.  (FAC, ¶¶ 84-85.)  Bunton refused to consent to the search without a warrant.  (FAC, ¶ 85.)  The CAT officers represented that they were authorized to search her home based on her boyfriend's parolee status.  (Id.)  The CAT officers then searched the entire home.  (Id.)  The CAT officers later submitted an offense report to HACCC, alleging that Bunton's boyfriend was not an authorized resident.  (FAC, ¶ 86.)  HACCC initially terminated her benefits for having an unauthorized resident, but that decision was rescinded on appeal.  (FAC, ¶ 87.)

Santeya Williams.  In January 2007, Antioch police officers visited Williams' home, responding to her request for assistance to stop a threat of domestic violence by one Mr. Batieste.  (FAC, ¶ 60.)  The following day, CAT officers came to Williams' home to ask whether Batieste had returned.  (FAC, ¶ 62.)  When Williams invited them into her home to talk, the officers searched the entire home for evidence that Batieste was living at the residence.  (Id.)  On March 28, 2007, a CAT officer wrote Williams' landlord, advising him that an adult male, who likely was not on the lease, was living with Williams, and advising him that his

tenant had two pit bull dogs that were causing a nuisance.  (FAC, ¶ 63.)  The letter warned that the landlord could be held responsible for criminal or nuisance related activity on his property. (Id.)  CAT forwarded the same accusations regarding Williams to HACCC, and HACCC issued a notice proposing to terminate Williams' benefits.  After a hearing in which the CAT officer at issue testified, HACCC decided not to sustain the proposed termination.  (FAC, ¶ 64.)

Mary Scott.  On January 11, 2007, CAT officers began an investigation into Scott's home "due to constant domestic disputes at the location."  (FAC, ¶ 67.)  On January 16, 2007, CAT officers entered Scott's home without her consent.  (FAC, ¶ 68.)  The officers claimed authorization to search the home based on an arrest warrant for Tyrone Young, who was visiting her home.  (Id.)  The officers searched Scott's entire home and garage.  (Id.) Subsequently, a CAT officer sent a letter to HACCC alleging that Mr. Young's presence in Scott's home was a violation of her Section 8 obligations.  (FAC, ¶ 69.)  A CAT officer also sent a letter to Scott's landlord advising him of Young's arrest, and warning him that he could be held responsible for criminal or nuisance related activity on his property.  (FAC, ¶ 70.) From January or February 2007 to October 2007, CAT officers called Scott's landlord on an almost weekly basis to ask if the landlord had evicted Scott.  (FAC, ¶ 71.)  The landlord was also told by an Antioch police officer to be careful about renting to African-American tenants. (Id.)  HACCC thereafter terminated Scott's Section 8 voucher, but later rescinded that termination.  (FAC, ¶ 72.)

Karen Coleman.  In June 2007, APD officers came to Coleman's home, claiming to have authorization to search her home for her husband.  Mr. Coleman was a parolee, but his parole officer denied authorization for a parole search and only gave APD officers authorization for a compliance check of Mr. Coleman.  (FAC, ¶ 75.)  Although Ms. Colman objected to the search, the officers persisted, damaged the front door, searched the home, took photographs, and told her she would lose her Section 8 benefits.  (Id.)  Officers handcuffed Ms. Coleman during the search and threatened to handcuff her child if he called the police station to speak to their supervisor.  (Id.)  Thereafter, a CAT officer reported to HACCC that Ms.

Coleman had violated her obligations under Section 8.  (FAC, ¶ 76.)  Ms. Coleman was later

granted permission by HACCC to add Mr. Coleman to her lease.  (FAC, ¶ 77.)  CAT officers

returned to Ms. Coleman's residence on two occasions looking for Mr. Coleman.  (FAC, ¶¶ 78-

79.)  The officers did not conduct a search the first time, but the second time they handcuffed

Ms. Coleman and searched the home after Ms. Coleman's sister, who did not live at the

residence, allowed them into the home.  (Id.)  On July 3, 2007, CAT officers visited Mr.

Coleman's place of employment and questioned him about residing with his wife.  (FAC, ¶

80.)  Mr. Coleman told them he was on the lease, but the CAT officers still threatened him with

arrest if they found him at the home.  (Id.)  The CAT officers also asked to see Mr. Coleman's

employment records, to which his employer refused.  (Id.)  The CAT officers made several

such visits to Mr. Coleman's place of employment.  (Id.)

Alyce Payne.  Payne sought police assistance in connection with incidents of domestic

violence.  (FAC, ¶ 91.)  On March 21, 2007, a CAT officer contacted HACCC to report

Payne's "constant need for police presence" at her residence, and her alleged criminal record

and that of her children and boyfriend.  (FAC, ¶ 92.)  HACCC thereafter issued a notice of

intent to terminate Payne's Section 8 benefits.  (FAC, ¶ 93.)  After Payne secured legal

representation, HACCC withdrew that notice.  (Id.)  Subsequently, a CAT officer sent a letter

to Payne's landlord advising him that his residents had been the subject of several disturbance

related incidents, and had been involved in criminal activity that had lead to arrests.  (FAC, ¶

94.)  The letter also warned the landlord that he could be held responsible for criminal or

nuisance related activity on his property.  (Id.)  CAT officers followed up that letter with a

phone call and additional letter to the landlord.  (FAC, ¶¶ 95-96.)  In December 2007, Payne's

landlord, citing the CAT letters, advised her that her lease would not be renewed.  (FAC, ¶ 97.)

Plaintiff then moved to Bay Point, California, and continues receive Section 8 vouchers.  (Id.)

## II.    **LEGAL STANDARD**

To obtain class certification, the plaintiff must demonstrate that each of the four

requirements of Rule 23(a) and at least one requirement of Rule 23(b) are met.  Narouz v.

Charter Comm'n, LLC, 591 F.3d 1261, 1266 (9th Cir. 2010). "The four requirements of Rule

23(a) are commonly referred to as 'numerosity,' 'commonality,' 'typicality,' and 'adequacy of representation' (or just 'adequacy'), respectively." United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO v. ConocoPhillips Co., 593 F.3d 802, 806 (9th Cir. 2010).  Rule 23(b) requires that the plaintiff establish that: (1) there is a risk of inconsistent adjudication, or adjudication of individual class member's claims would substantially impair non-party members' ability to protect their interests; (2) the defendant acted on grounds generally applicable to the class; or (3) common questions of law or fact predominate and class resolution is superior to other available methods.  Fed.R.Civ.P. 23(b); Dukes v. Wal-Mart Stores, Inc., 603 F.3d 571, 580 (9th Cir. 2010) (en banc).

The district court has broad discretion in determining whether to certify a class.  Vinole v. Countrywide Home Loans, Inc., 571 F.3d 935, 942 (9th Cir. 2009).  For purposes of class certification, the court generally accepts the substantive allegations of the complaint as true.  In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig., 691 F.2d 1335, 1342 (9th Cir. 1982).  Moreover, "[a]lthough some inquiry into the substance of a case may be necessary to ascertain satisfaction of the commonality and typicality requirements of Rule 23(a), it is improper to advance a decision on the merits to the class certification stage." Staton v. Boeing Co., 327 F.3d 938, 954 (9th Cir. 2003).

In conducting its review of a class certification motion, "the trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23." Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1186 (9th Cir.), amended, 273 F.3d 1266 (9th Cir. 2001) (citation omitted); Gen. Tel. Co. of the S.W. v. Falcon, 457 U.S. 147, 161 (1982).

## III.    DISCUSSION

### A.    ASCERTAINABLE CLASS

"As a threshold matter, and apart from the explicit requirements of Rule 23(a), the party seeking class certification must demonstrate that an identifiable and ascertainable class exists." Mazur v. eBay Inc., 257 F.R.D. 563, 567 (N.D. Cal. 2009).  "A class definition should be precise, objective, and presently ascertainable." Id. (citing O'Connor v. Boeing N. Am., Inc.,

1    184 F.R.D. 311, 319 (C.D. Cal. 1998)).  The class definition must be sufficiently definite so

2    that its members can be ascertained by reference to objective criteria.  Whiteway v. FedEx

3    Kinko's Office and Print Servs., Inc., 2006 WL 2642528, at *3 (N.D. Cal. 2006) (Armstrong,

4    J.).  "[A] class will be found to exist if the description of the class is definite enough so that it is

5    administratively feasible for the court to ascertain whether an individual is a member."

6    O'Connor v. Boeing N. Am., Inc., 184 F.R.D. 311, 319 (C.D. Cal. 1998).

7             Here, Plaintiffs define the proposed class as:

8                     all African-Americans who have held, currently hold, may hold, or
                      are erroneously regarded by the City and officers of the Antioch
9                     Police Department as holding, Section 8 housing vouchers, and all
                      members of their households, who reside, have resided or will
10                    reside, in the City Antioch.

11   (Plf.'s Motion at 20.)

12            Defendant objects to the proposed class definition on two grounds.  First, Defendant

13   objects to including as class members those who "may hold" Section 8 housing vouchers and

14   those who "will reside" in the City, on the basis that these categories encompass future class

15   members.  That argument is without merit, as is well-settled that a class may be defined to

16   include individuals who may not become part of the class until later.  See Rodriguez v. Hayes,

17   591 F.3d 1105, 1118 (9th Cir. 2010) ("…inclusion of future class members in a class is not

18   itself unusual or objectionable."); Probe v. State Teachers' Ret. Sys., 780 F.2d 776, 780 (9th

19   Cir. 1986) ("The fact that the class includes future members does not render the class definition

20   so vague as to preclude certification.").

21            Second, Defendant objects to including in the class those that "are erroneously regarded

22   by the City and officers of the Antioch Police Department as holding" Section 8 vouchers

23   because determining who fits in that category is neither administratively feasible nor

24   objectively reasonable.  Specifically, such a determination would require inquiring into the

25   subjective mindsets of individual police officers.  Plaintiffs offer no rebuttal to that argument in

26   their reply brief.  Nor do Plaintiffs propose any objective criteria that could be employed.

27   Indeed, this Court agrees that individuals that police officers erroneously regard as holding

28   Section 8 vouchers cannot be ascertained by reference to any objective criteria.

"[D]istrict courts have broad discretion to modify class definitions . . . ."  Powers v. Hamilton County Public Defender Com'n, 501 F.3d 592, 619 (6th Cir. 2007); see also In re Monumental Life Ins. Co., 365 F.3d 408, 414 (5th Cir. 2004) ("District courts are permitted to limit or modify class definitions to provide the necessary precision.").  Accordingly, the Court finds that the following modified class definition sets forth an ascertainable class:

> all African-Americans who have held, currently hold, or may hold
> Section 8 housing vouchers, and all members of their households,
> who reside, have resided or will reside, in the City Antioch.

The Court next considers the Rule 23(a) and Rule 23(b) requirements under that modified class definition.

### B.   RULE 23(a) REQUIREMENTS

#### 1.   Numerosity

Plaintiffs have provided evidence showing that, from 2006 to 2009, there were 1,061 African-American Section 8 households in Antioch.  (Dang Decl., ¶ 5(b); Krisberg Decl. at 12:13-15.)  Defendant does not contest that number, but instead focuses on the fact that "only" five named plaintiffs and forty-nine putative plaintiffs have been identified during discovery.  This focus, however, is misplaced.  As Plaintiffs correctly point out, membership in a Rule 23 class is neither limited to those individuals who affirmatively express a desire to join the class, nor is it the test for numerosity.  See Kincaid v. City of Fresno, 244 F.R.D. 597, 601 (E.D. Cal. 2007) (numerosity satisfied even though only 23 of the estimated 8,000 potential claims for damages were ultimately filed).  Plaintiffs are not required to name every potential class member as a named Plaintiff, and in fact, such a requirement would defeat the purpose of class litigation.  Lehr v. City of Sacramento, 259 F.R.D. 479, 482 (E.D. Cal. 2009); see also Ikonen v. Hartz Mountain Corp., 122 F.R.D. 258, 261-262 ("When considering numerosity and the impracticability of joinder, it is unnecessary for the class representatives to either identify each particular member of a class, or to state the exact number of persons in a class.").

Based on the number of class members involved, the Court finds that Plaintiffs meet the numerosity requirement.  See Dukes, 603 F.3d at 599.

### 2.     Commonality

"Commonality focuses on the relationship of common facts and legal issues among class members."  Id.  Rule 23(a)(2) should be construed permissively, meaning that "[a]ll questions of fact and law need not be common to satisfy the rule.  The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class."  Id. (quoting Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998)).  "[T]he commonality requirement is interpreted to require very little."  In re Paxil Litig., 212 F.R.D. 539, 549 (C.D. Cal. 2003).  A single issue common to the proposed class may suffice under Rule 23(a)(2).  See Cervantez v. Celestica Corp., 253 F.R.D. 562, 570 (C.D. Cal. 2008).

Here, Plaintiffs identify the following common questions of fact:  (1) whether Defendant and its CAT unit targeted Section 8 recipients; (2) whether the targeting of Section 8 households has an adverse impact upon African-Americans; (3) whether Defendant and its CAT unit have engaged in a pattern or practice of intentionally targeting African-American Section 8 recipients; (4) whether Defendant and its CAT unit conducted illegal home searches of Section 8 recipients; (5) whether Defendant and its CAT unit make or have made unfound referrals, including domestic violence incidents, to the HACCC for Section 8 recipients, particularly those who are African-American; (6) whether Defendant and its CAT unit disproportionately contact Section 8 landlords, particular those with African-American tenants, and threaten them with liability for the conduct of their tenants; and (7) whether Defendant can prove a legitimate, no-discriminatory reasons for its policies, and if so, whether there are less discriminatory alternatives available.

Furthermore, Plaintiffs have identified common questions of law to include whether Defendant's conduct constitutes actionable discrimination under the adverse impact or intentional discrimination theories or violates FEHA's "source of income" provision, whether injunctive relief is warranted, and whether Defendant is liable for class statutory damages.

Defendant argues that Plaintiffs cannot establish commonality because not all putative class members have had contact with the CAT unit, have had their homes searched, have had

their landlords harassed, or have been referred to HACCC.  However, commonality does not

require that each class member has been injured by the challenged practice in the same way.

See Stanton v. Boeing Co., 327 F.3d 938, 953-54 (9th Cir. 2003).  In rejecting a similar

argument, this Court has explained:

> the essence of defendants' argument - that in order to prove the existence of the
> forest the plaintiffs must individually prove the existence of each tree - is
> anathema to the very notion of a class action.  Taken to its logical conclusion,
> under defendants' reasoning, no civil rights class action would ever be
> maintainable, because, in order to prove the existence of a discriminatory pattern
> or practice, each class member would have to individually prove the highly
> individualized factors relating to each instance of discrimination they allegedly
> suffered.  This would simply obviate the concept of the class action lawsuit.

Californians for Disability Rights, Inc. v. California Dept. of Transp., 249 F.R.D. 334, 345

(N.D. Cal. 2008) (Armstrong, J.).

   In sum, Plaintiffs have shown that their discrimination claims present common

questions of law and fact, and the Court finds that Plaintiffs' showing is sufficient to satisfy

their burden of establishing "commonality" under Rule 23(a)(2).

### 3. Typicality

   "Typicality" requires that "the claims or defenses of the representative parties are

typical of the claims or defenses of the class."  Fed.R.Civ.P. 23(a)(3). "The purpose of the

typicality requirement is to assure that the interest of the named representative aligns with the

interests of the class."   Hanon v. Dataprods. Corp., 976 F.2d 497, 508 (9th Cir. 1992).  "The

test of typicality is whether other members have the same or similar injury, whether the action

is based on conduct which is not unique to the named plaintiffs, and whether other class

members have been injured by the same course of conduct."  Id. (internal quotations omitted).

"Under the rule's permissive standards, representative claims are 'typical' if they are

reasonably co-extensive with those of absent class members; they need not be substantially

identical."  Hanlon, 150 F.3d at 1020.

   Here, Plaintiffs allege that the five named Plaintiffs have been subject to investigation

and targeting by Defendant.  Although their experiences may differ, the allegations of each

named Plaintiff all implicate the same course of conduct by Defendant - illegal discrimination

1  based on their race and status as Section 8 participants.  These claims, if true, indicate that the

2  interests of other class members would be adequately represented by the named Plaintiffs as

3  they are seeking injunctive relief to prevent future illegal practices from being employed by

4  Defendant.

5       Defendant again argues that the disparate experiences of the class members preclude a

6  finding of typically with the five named Plaintiffs.  As indicated above, the fact that not all

7  class members have been discriminated against in the same way does not preclude class

8  certification.  In this case, the interests of the class would be adequately represented by the

9  named Plaintiffs, who allege they have been discriminated against and are attempting to

10 prevent future violations to others through injunctive relief.  See, e.g., Dukes v. Wal-Mart

11 Stores, Inc., 222 F.R.D. 137, 171 (N.D. Cal. 2004) ("Plaintiffs' claims for injunctive and

12 declaratory relief, if successful, would achieve very significant long-term relief in the form of

13 fundamental changes to [Defendant's policies] that would benefit not only current class

14 members, but all future female employees as well.").

15      Thus, this Court finds that Plaintiffs have adequately shown typicality.

16             **4.      Adequacy of Representation**

17      The fourth and final requirement under Rule 23(a) is that the plaintiff "will fairly and

18 adequately protect the interests of the class."  Fed.R.Civ.P. 23(a)(4).  In this regard, the Court

19 considers: (1) whether the named plaintiffs and their counsel have any conflicts of interest with

20 the proposed class, and (2) whether the named plaintiffs and their counsel will "prosecute the

21 action vigorously on behalf of the class."  Hanlon, 150 F.3d at 1020.

22      Plaintiffs and their counsel aver that they have no conflicts of interest with members of

23 the class and that they will continue to prosecute this action vigorously on behalf of the class as

24 a whole.  (Plfs.' Motion at 23:11-14.)  As Defendant does not contend otherwise, the Court

25 concludes that Plaintiffs have met their burden under Rule 23(a)(4).

26        **C.     RULE 23(b) REQUIREMENTS**

27       As noted, in addition to the four requirements under Rule 23(a), a plaintiff seeking

28 class certification must meet one of the three criteria under Rule 23(b).  Plaintiffs rely on

1  Rule 23(b)(2), which allows for certification if "the party opposing the class has acted or

2  refused to act on grounds generally applicable to the class, thereby making appropriate final

3  injunctive relief or corresponding declaratory relief with respect to the class as a whole."

4  Fed.R.Civ.P 23(b)(2).

5       Here, Plaintiffs seek injunctive and declaratory relief to address Defendant's

6  allegedly discriminatory policies and practices.  As such, this case falls within the purview

7  of Rule 23(b)(2).  Zinser, 253 F.3d at 1195 ("Class certification under Rule 23(b)(2) is

8  appropriate only where the primary relief sought is declaratory or injunctive.").  Moreover,

9  "[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime

10  examples" of Rule 23(b)(2) classes.  Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 614

11  (1997).  Defendant's argument to the contrary – that injunctive relief would require

12  individualized adjudication of each member's claim and the harm he or she is alleged to have

13  suffered – is not persuasive.  See Rodriguez, 591 F.3d at 1125 ("[t]he fact that some class

14  members may have suffered no injury or different injuries from the challenged practice does

15  not prevent the class from meeting the requirements of Rule 23(b)(2)."); see also Gibson v.

16  Local 40, Supercargoes and Checkers, 543 F.2d 1259, 1264 (9th Cir. 1976) ("A class action

17  may be maintained under 23(b)(2), alleging a general course of racial discrimination by an

18  employer or union, though the discrimination may have … affect[ed] different members of the

19  class in different ways.").

20       Additionally, Plaintiffs' claims under Cal. Civ. Code § 52 for statutory minimum

21  damages for the class and compensatory damages for the five named Plaintiffs, while

22  significant in terms of monetary amount, do not preclude Rule 23(b)(2) certification because

23  the predominant form of relief Plaintiffs seek by this action, as a whole, is injunctive relief to

24  change Defendant's policies.  See Arnold v. United Artists Theatre Circuit, Inc., 158 F.R.D.

25  439, 450-51 (N.D. Cal. 1994) ("Class actions certified under Rule 23(b)(2) are not limited to

26  actions requesting only injunctive or declaratory relief, but may include cases that also seek

27  monetary damages …. However, a class may not be maintained under subpart (b)(2) where the

28  appropriate final relief relates exclusively or predominantly to money damages.") (citing Probe

1   v. State Teachers' Retirement System, 780 F.2d 776, 780 (9th Cir. 1986)) (internal quotations

2   omitted).

3          Plaintiffs have also shown that this case satisfies the requirements of Rule 23(b)(3),

4   which are that "questions of law or fact common to the class members predominate over any

5   questions affecting only individual members," and that class resolution is "superior to other

6   available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P.

7   23(b)(3).  Here, Plaintiffs have identified common questions of law and fact, as indicated

8   above.  They have also shown that class resolution is superior due to the number of plaintiffs

9   and the policy changes they seek, and because class members, due to their economic

10  conditions, would be unlikely to pursue these claims individually.

11         D.    APPOINTMENT OF CLASS COUNSEL

12         Plaintiffs request that the Court appoint the Impact Fund and Bingham McCutchen LLP

13  as co-lead class counsel, pursuant to Rule 23(g)(1).  In appointing class counsel, the Court must

14  consider (1) the work counsel has done regarding the action; (2) counsel's experience with

15  class actions and relevant complex litigation; (3) counsel's understanding of relevant law; and

16  (4) the resources counsel will commit to representing the class.  Fed R. Civ. P. 23(g)(1)(A).  A

17  certification order must appoint class counsel.  Fed. R. Civ. P. 23(c)(1)(B).

18         Here, Plaintiffs' co-lead class counsel, the Impact Fund and Bingham McCutchen LLP,

19  have pursued this action since its early stages.  The record shows that the both organizations

20  have extensive experience in lawsuits such as the present and that their attorneys are well

21  versed in the laws pertaining to civil rights and discrimination actions.  (Seligman Decl. ¶¶ 3-9,

22  Docket 92.)  Similarly, as evidenced by counsels' filings, the Court is aware that the Impact

23  Fund and Bingham McCutchen LLP, has committed extensive resources to prosecuting this

24  case.  Given this showing, coupled with Defendant's lack of opposition, the Court grants

25  Plaintiffs' request to appoint Impact Fund and Bingham McCutchen LLP as co-lead counsel for

26  the class.

27         In addition to the Impact Fund and Bingham McCutchen LLP, Plaintiffs also seek to

28  have the ACLU of Northern California, Public Advocates, Inc., the Lawyers' Committee for

Civil Rights of the Bay Area, and Haywood Gilliam of Covington & Burling LLP appointed as class co-counsel.  Plaintiffs have proffered sufficient, undisputed evidence regarding the qualifications of each of these organizations and their respective suitability to serve as class counsel.  (<u>Id.</u>, ¶¶ 10-16.)  The Court therefore grants Plaintiffs' request to appoint these attorneys as class counsel, as well.

   **E.**  **PLAINTIFFS' EVIDENTIARY OBJECTIONS**

   Both parties have submitted evidentiary support with their papers (including deposition transcripts, expert reports, and documentary evidence), and have relied heavily on that evidence in making their respective arguments regarding the merits of Plaintiffs' claims.  Additionally, Plaintiffs have objected to and moved to strike large portions of Defendant's supporting evidence on various evidentiary grounds, including failure to comply with Civil Local Rule 7-5.[1]  (Docket Nos. 191, 193.)

   As noted above, at the class certification stage, the Court generally accepts the substantive allegations of the complaint as true, and does not make a decision on the merits.  Because this Court has relied herein primarily on the factual allegations in Plaintiffs' First Amended Complaint, Plaintiffs' evidentiary objections are moot.

**IV.** **<u>CONCLUSION</u>**

   For the reasons stated above,

   IT IS HEREBY ORDERED THAT:

   1.  Plaintiffs' Motion for Class Certification is GRANTED, as follows:

---

[1] Rule 7-5 requires that "[f]actual contentions made in support of or in opposition to any motion must be supported by an affidavit or declaration and by appropriate references to the record."  This Court notes that, in many instances, Defendant has vaguely cited to entire exhibits or to voluminous deposition transcripts, without providing adequate references.  Defendant is <u>specifically advised</u> to comply with Rule 7-5 in future briefing.  <u>See</u> <u>Mannick v. Kaiser Found. Health Plan, Inc.</u>, 2006 WL 2168877 at *18 (N.D. Cal. 2006) ("The court … is not required to consider… evidence that is buried in a two-foot-tall stack of paper, where the parties do not specifically direct the court's attention to the exact page where the evidence is to be found….").  In addition, Defendant is advised to use the same font size in footnotes as in the body of a brief, so as to not circumvent the page limitations of Civil Local Rule 7-4.

1          a)    The Class is certified to include: "all African-Americans who have held,

2    currently hold, or may hold Section 8 housing vouchers, and all members of their households,

3    who reside, have resided or will reside, in the City Antioch."

4          b)    Named Plaintiffs Priscilla Bunton, Santeya Williams, Mary Scott, Karen

5    Coleman, and Alyce Payne are appointed as representatives of the Class defined above.

6          c)    Pursuant to Federal Rule of Civil Procedure 23(g)(1) and Rule

7    23(c)(1)(B), the Impact Fund, Bingham McCutchen LLP, the ACLU of Northern California,

8    Public Advocates, Inc., the Lawyers' Committee for Civil Rights of the Bay Area, and

9    Haywood Gilliam of Covington & Burling LLP are appointed as Class Counsel.

10      2.    Plaintiffs' evidentiary objections filed in connection with this motion (Docket

11   Nos. 191, 193) are DENIED as moot.

12      3.    This Order terminates Docket Nos. 90, 191, and 193.

13   Dated: September 2, 2010

14                                     SAUNDRA BROWN ARMSTRONG

15                                     United States District Judge